HARRY O'GRADY, Appellant, v. JOSEPH M. CADWALLADER, Appellee.

PHYSICIANS AND SURGEONS: Negligence—Unsuccessful Operation. An action for damages for malpractice may not rest on a simple showing that the treatment or operation was not successful. The all-essential is a showing that the shortcoming in the treatment or operation was due to a failure on the part of the physician to employ that degree of skill ordinarily possessed by practitioners, under like circumstances, in the locality in question.

*Appeal from Osceola District Court.*—W. D. BOIES, Judge.

MARCH 18, 1918.

ACTION to recover damages for alleged negligence in setting a broken arm. Judgment for the defendant. Plaintiff appeals.—*Affirmed.*

*C. A. Babcock* and *Clark & Dwinell,* for appellant.

*W. C. Garberson* and *Dutcher & Davis,* for appellee.

GAYNOR, J.—Plaintiff brings this action to recover damages for injuries alleged to have been sustained by him because of the unskillful and negligent manner in which the defendant, a practicing physician, reduced and treated a certain fracture of the radius of plaintiff's left arm. It is

claimed in the petition that, on the 4th day of June, 1914,
plaintiff was kicked by a horse, and the radius in his left
forearm broken about midway between the elbow and the
wrist; that he applied to the defendant for treatment, and
employed him as a physician and surgeon to treat the in-
jury so received; that the defendant undertook to do so,
but did not reduce the fracture, but carelessly and negli-
gently treated and attended the same; that, in pretending
to reduce the fracture, defendant at first used pasteboard
splints, and afterwards used inadequate and improper
splints, in the way of pieces of shingle; that the pasteboard
and shingle splints did not keep the broken ends of the ra-
dius in proper place; that plaintiff submitted himself to the
treatment of the defendant for the injury until about the
middle of September, when plaintiff concluded that defend-
ant had not properly reduced the fracture, basing this con-
clusion on the fact that plaintiff could not at that time ro-
tate his forearm, hand, and wrist; that thereafter, on the
23d day of September, plaintiff consulted a physician and
surgeon in Sioux City, one Dr. Cremin, who examined the
forearm, and found that the same could not be rotated, and
that a surgical operation was necessary to put the same in
as good condition as possible; that, on the 26th day of Sep-
tember, Dr. Cremin performed an operation on the arm, and
found that the radius had been fractured, as stated, and that,
at and near the fracture, the radius had adhered and grown
fast to the ulna; that the operation consisted in separating
the radius and ulna, thus restoring rotation; that an incision
was made in plaintiff's arm for that purpose; that the condi-
tion in which the arm was found was due to the careless,
negligent and unskillful act of the defendant in reducing
said fracture, and his carelessness and negligence in not
putting and joining together the broken ends of the radius,
and in not putting the ends in alignment or proper apposi-
tion, and in not applying proper bandages and splints and

appliances to keep the broken ends in alignment or proper apposition, thus not preventing the radius from adhering or growing fast to the ulna. The answer was a general denial. The burden of proof rested upon the plaintiff. The allegation of negligence upon which recovery is sought is: First, that the defendant was negligent in not reducing the fracture properly; second, that the defendant was negligent in using only pasteboard splints at first, and afterwards inadequate and improper splints, and in not applying proper bandages and appliances to keep the broken ends in alignment or proper apposition.

There is no direct evidence in this record showing that the fracture was not properly reduced. There is no direct evidence that the broken parts were not put in proper apposition. There is no direct evidence that the splints and bandages used for the purpose of keeping the broken parts in apposition and the bone in proper alignment were not the appliances that are usually and ordinarily used by physicians and surgeons in the treatment of fractures such as this. A physician is held to the exercise of the skill and learning of the profession generally in the community in which he practices.

This is purely a fact case, with the burden resting on the plaintiff. At the conclusion of the testimony, the court directed a verdict for the defendant. Plaintiff appeals.

As we have said before, there is no direct evidence to support the allegations made in plaintiff's petition, that the fracture was not properly reduced, or that the splints and bandages used for the purpose of keeping the broken bones in apposition or the bones in alignment were not the splints and bandages usually and ordinarily used by physicians in treating injuries of this kind. No witness was called, expert or otherwise, to establish either one of these facts charged by the plaintiff. The conclusion, then, that the defendant failed in the full discharge of his duty, to the injury of the

plaintiff, must be gathered deductively from the matters to which we will call attention later in this opinion.

It is fundamental that no negligence, if any exists, can be considered by the jury, in arriving at the verdict, except that negligence which is charged in the petition, and on which the plaintiff bottoms his right to recover; and but two acts of negligence are charged: First, nonprofessional and improper reduction of fracture; second, improper appliances used to keep the fracture in position. Any other acts, or omission to act, on the part of the defendant in the treatment of this injury, whether negligent or otherwise, which do not involve these two charges of negligence, afford no basis for recovery.

The evidence discloses the following: On the morning of June 4, 1914, plaintiff was kicked by a horse; the kick broke his left arm; he went to Ashton and consulted the defendant; he reached defendant's office about 8 o'clock, and found defendant in his office. He told the doctor he thought he had broken his arm, and asked the doctor to set it and attend to it. The doctor put pasteboard splints on it and put it in a sling, a splint on the inside and one on the outside, opposite each other. Then he bandaged it, and made a cloth sling in which to carry it. Plaintiff was at the doctor's office about half an hour; stayed around town awhile. He was told by the doctor to come back; that he might see how everything was. The doctor told him to come back the next day. Plaintiff came back the next day, on the 5th of June, in the afternoon. The doctor took the bandages off and put more on, but did not change the splints. On his return home, on the afternoon of that day, a cyclone passed through the county, and the buggy in which plaintiff was riding was tipped over. He was thrown into the water. This was about five or six in the afternoon. It was raining hard. When he reached his home that night, the splints were all wet and soaked with water. The home

folks unwrapped the arm and took off the wet bandages and splints and bandaged the arm up again. When he tipped over, he fell into the water, with others who were riding in the buggy, among whom was a young girl, about nine years of age. He carried the girl out of the water. He said he felt no bad effects from this. The next day, however, about noon, he went to the doctor's office. He reached there about one o'clock. The splints were then taken off by the doctor, and the arm was rebandaged, the doctor using wire net, or some other appliance, and placing wooden splints on the arm, shaped to his arm. The doctor bandaged the arm up, and told him to come back in a day or two. He went back in a day or two. Thereafter, he came back to the doctor's office two or three times a week, he says. In about a week after that, on June 12, 1914, he went to Sioux City, and remained until the 22d of June. The arm had no attention while he was in Sioux City. The splints were finally taken off some time in July. The witness was unable to say what time in July, but thinks not later than the 15th of July.

Plaintiff testifies that he had pain in his arm while the splints were on; that he had also pain in his shoulder and his wrist; that he told the doctor about these pains; that the doctor told him he would get all right,—that that was the case with a broken bone; that, when the splints were taken off in July, he could not rotate his arm, could not turn it over; that it hurt him when he tried to turn it over; that defendant told him to go ahead and do a little work, and it would get all right. The doctor never put any more splints on, but told him not to try to lift too much, but to be careful with it. Some time after, the exact date of which is not shown in this record, the plaintiff met the doctor in a hardware store. At that time, some talk was had between them touching an X-ray examination. It was,

however, the last day that plaintiff saw the doctor. He testifies:

"I don't remember just when it was. I didn't agree to see him again, and I didn't refuse to have an X-ray taken. The doctor said he would take me to have an X-ray, and if the arm was not right, he would foot the bill; that if it was, I was to pay it. I never saw him again until after the operation was performed at Sioux City. I went to Sioux City on the 22d of September, and was operated on by Dr. Cremin on the 26th. I had an X-ray examination taken and photographed."

These photographs were introduced in evidence. Later in his testimony, he excused his not having an X-ray examination sooner, on the ground that the defendant told him it would be all right, and that he didn't care to incur the expense of an X-ray examination.

This is all the testimony offered in the record showing the treatment administered by the defendant.

Experts were, however, called by the plaintiff,—among them, Dr. Cremin. This doctor testified that he operated on the plaintiff on the 26th day of September; that he found that the radius of plaintiff's left arm had been broken somewhere near the center, between the wrist and the elbow; that he made an incision, laid the bones bare, found a large callus thereon at this fracture; that it had adhered and grown fast to the ulna. He testified that, in the most skillful setting of bones, there will be a little ridge around the place of the fracture. He testified:

"I freed the attachment by cutting the callus from the ulna, so that the bones could rotate. After the fracture, the alignment should have been the same, with the exception of what little callus formation there might have been, and it would have been that way if it had been properly reduced and cared for. After a radius is broken, the tendency is to pull it towards the ulna. The object of the splints

is to keep the two ends of the bone in a line, but the splints would not keep the bones directly touching one another. If the radius be properly reduced and properly healed from a proper reduction, they will, after such reduction and healing, be in about the same position they were before the fracture. When I cut down to the bone of the arm, the condition was different than was shown by the X-ray, for the X-ray showed there was no union of the two bones, and showed the bones were more out of alignment than they were. I found there was a good union of the bones, but the callus had bridged across the space between the radius and the ulna, and the bones were bound together by it, and this prevented the rotation. The fracture was an oblique one, downwards towards the hand. In spite of all a surgeon can do, and all the skill he can exercise, there is always some departure from a true alignment, in cases of a fracture. It is good practice for a surgeon, in cases of this kind, to exhaust every effort to secure a good functional result without an open operation."

He was asked this question:

"Now do you remember whether or not the radius lay upon the ulna or against the ulna down toward the wrist, other than right against the fracture in any other place? A. I don't think there was anything at any place except at the line of the fracture. There was some space between the two bones. You could see between the two bones with an X-ray."

He was asked this question:

"Was the space normal,—was there as big a space there as there would have been had the radius not been broken? A. Well, I think this callus might have pulled the radius closer to the ulna. Q. So that it affected the space clear down to the wrist? A. It may have. Q. What would you say as to whether the two ends of that broken radius had been properly set,—that is, put in proper apposition

to each other at the time of the reduction of the fracture? A. All I could testify to is as to what the condition was at the time I examined it. I don't know whether they were put together right at the time or not. Q. Well, then, from the fact of that line as you saw, the bones there not being straight,—that is, with the exception of that little ridge there might be, made by the callus,—what do you say as to whether or not, on the theory that the patient had followed the doctor's directions, and was not to blame for anything, whether or not that fracture had been properly reduced? A. The fracture could have been properly reduced, but, due to the injury, and the possibility of the other bone being inflamed, it might have been pulled apart later. Q. But where a physician had charge of the fracture, which took place on the 24th of June, 1914, up to about the middle of September, seeing it on an average of twice a week, seeing the patient, and supposing the patient had followed the physician's directions as to the care and how he should treat the arm in the absence of the physician,—from what you saw there, the bones not being in alignment, what would you say as to whether the physician had done his duty or not,—as to whether he was to blame for that condition? A. Well, a physician might do all in his power to set a bone properly; and, as I stated before, if there was trouble with the other bone, regardless of what he might do, there might be some adherence there. Q. As I understand, your operation was to chisel away or remove in some way the callus separating the radius and the ulna, so that rotation would be possible? A. Separating the callus from the radius and ulna,—yes, sir. Q. Making it so it would rotate? A. Yes, so it would rotate. Q. And in order to do that, you had to chisel away the callus? A. Yes, sir. Q. And round it up and smooth it so it would roll? A. Yes, sir. Q. That is all you saw that was necessary to be done? A. At the time of the operation,—yes, sir. The X-ray I exam-

ined deceived me as to the true condition of the arm, and I reached the conclusion, from an examination of the X-ray picture, that there was no union, and that the bones were much more out of alignment than they actually were, when I got into the arm, after making the incision. I found there was excessive callus. Q. So far, then, as the position of the bones with reference to each other at the time is concerned, there could have been rotation of the arm, if it had not been for this bridge of callus? A. Yes, sir. Q. What would you say, Doctor, with the excessive amount of callus removed that you found there, whether this radius was in sufficient alignment to give good functional results? A. I would say, yes. Q. So I will ask you if it isn't true that the condition you found there, aside from the excessive callus, was a good result from the treatment of the fracture of the radius? A. Yes, I think that was all right. Q. And when you made your incision, and found what the actual conditions were, as distinguished from the conditions you were deceived into believing by the X-ray, you didn't perform the operation you intended to make? A. No, sir. Q. You didn't do it because you found the bones united, and good alignment? A. Yes, sir. Q. And if you had found, after making this incision, that the bones were not in sufficient alignment to produce a good functional result, it would have been your duty, as a physician and surgeon, to operate and correct that deformity at that time? A. Yes, sir. Q. And it was because you found the condition of good alignment and union of the bones that you did not operate,—that is, you did not perform the operation you intended? A. Yes, sir."

The doctor further testified:

"The amount of callus in a normal case depends upon the extent of the fracture and the degree of excitement or nervous state of the patient, and irritation occurring at the seat of the fracture, and the amount of callus thrown out,

is a thing over which the physician and surgeon has. no control. In some cases, due to reasons we know nothing about, there is a deficient amount of callus thrown out, and in some cases, an excessive amount thrown out. Where there is an excessive amount of callus thrown out, there is always a possibility that a portion of it will be absorbed, and it is a fact that there is, in the normal case, part of the callus absorbed, even after union takes place—it goes on for months. Q. Is there any way, now, that the surgeon treating such a fracture as the plaintiff had can tell whether there is excessive callus being thrown out, sufficient to cause a bridge between the radius and ulna, until he actually makes the test and finds the arm will not rotate? A. No. The time when it is safe to rotate is not the same in any two individuals. While it might be proper with one person in four or five weeks, in another case it might not be safe to rotate within six or seven weeks. When it is proper to rotate, is a matter of judgment. I think it can be determined by an outsider as well as by the attending physician. Even where there is excessive callus, and rotation is obstructed, no one can be sure that the excessive callus would not be absorbed. When I last saw the arm after my operation, he could rotate and supernate the arm freely. He had all the functional use of the arm he ever had. In the face of the highest degree of skill and care, there is practically never a straight line after a fracture. Skill and care, even the best, will not mend a broken bone and make it just as good as before the break or fracture, and will not insure that there is, after the healing, the same space between the ulna and radius as before. As much depends upon the conduct, constitution, and habits of the patient as upon the physician or surgeon attending him. Where a fracture of the radius is caused by the kick of a horse, there is liable to be some damage done to the ulna. That would encourage inflammation of the ulna, and the

bruise and inflammation would encourage the formation of callus, such as would bridge over between the two bones. No physician could prevent that."

Dr. Heatland, for the plaintiff, testified, in substance, that, as soon as a human bone is broken, nature immediately starts the process of repair, by throwing out an exudate, in the form of serum, that, in the course of time, runs around the fracture and thickens, and forms a jelly-like mass, and then that forms into a harder substance, called callus, and it is that callus that causes the bone to unite, and this acts as a splint around the bone.

"The closer the bones are got together, the less of this jelly-like substance is thrown out, and the farther apart the bones are, the more has to be thrown out, to bridge over the space. If it were found that the bones had adhered together at the place of the fracture, and the adhesion was not too strong, and the fracture held fairly strong, it is possible that it might be overcome by forcible rotation; and if not, the only other method left would be to open the arm and chisel away or remove that part of the callus. The callus might, in time, absorb and disintegrate itself, if the adherence was a small one. It might thin enough so that it could break loose by muscular exertion."

He further testified:

"If a fracture is properly reduced, the bone is put in proper apposition, there is but little pain in the process of healing. There is always a slight pain at first, on account of the swelling and the pressure on the nerves; but if there is excessive pain, and it continues, it shows that something is wrong. If the fracture has not been properly reduced, it might be the cause of the pain."

He further testified that, if the fracture is properly reduced, there is practically no loss of motion or function. There may be temporarily, but in course of time, that function will be restored, and the arm be practically as good as

before.   But in case of a fracture from the kick of a horse, there might be more or less injuries to the soft part surrounding the seat of the fracture.   There might be hemorrhage surrounding the fracture.   There might be laceration of the tissues surrounding the seat of the fracture.   To attach significance to pain, we would have to find out the extent to which the nerves were involved in an injury.   Some people are more susceptible to pain than others.   In the same injury, the pain will be different in different persons. There is more or less swelling, in case of a fracture of the radius, and the swelling depends upon the amount of injury to the soft parts surrounding the fracture.   Nature will sometimes throw out more callus than is necessary. The amount thrown out depends a good deal on the extent of the injury, and the amount of irritation.   The amount of callus that nature throws out is something the physician has no control over, unless he allows irritation, and that so excites it.   The closed method is the ordinary method of treating fracture.   The open method should not be resorted to unless the closed method fails.   There is danger of infection from the open method.   There is sometimes a bad result, in the face of the most skillful treatment.   All the surgeons can do is to put the bones in apposition and put the splints on, and then it depends upon nature and the patient himself, as much as upon the surgeon, as to the result.   The cases where there is a perfect union of a fracture, with no deformity at all, are rare.   There is no fixed time in which the bones will unite.   Sometimes they will not unite at all, under most skillful treatment.   It is possible that, in a fracture from the kick of a horse, the periosteum of the ulna might be injured.   If there was a bruising of the periosteum of the ulna on the side that is next to the radius, at or near the seat of the fracture, that might produce a complication.

Dr. Cram was called, and testified that the fracture

may have been properly reduced, and gone wrong subsequently; but, if it had been properly reduced, it certainly did not maintain the properly reduced condition, otherwise there couldn't be an abnormal condition at any time afterwards.

"It has nothing to do with the skill of the physician in the case at all. The physician may have skillfully reduced the fracture and put on his dressing, and it may have been knocked out afterwards and never been reduced again; but the bones indicate in the picture a union in an imperfect apposition. [It will be noted from the testimony of Dr. Cremin that the pictures did not show the true condition of the bones as he found it upon incision.] The adherence of the radius and ulna would not have anything to do with causing the pain, unless the nerve was involved; but in a callus, that is often the case. That is where the nerve is. The nerve is involved in the callus, and the callus is hardening and causes an increased pain. The amount of pain depends upon the injury to the soft parts and the nerves surrounding the fracture. A nerve may be involved in the callus formed, and thus cause pain."

Dr. Brock, called for the plaintiff, testified that if, in the operation on September 26, 1914, it was found that the callus had overflowed from the broken radius and adhered to the ulna for an inch or an inch and a half, absolutely preventing rotation, the only way it could be remedied was by sawing or chiseling off the superfluous callus.

We have not attempted to set out all the evidence, but have set out all the evidence bearing upon the negligence charged in the petition.

There is no direct evidence that the fracture was not properly reduced, no direct evidence that the splints and bandages were not the splints and bandages that are usually and ordinarily used by physicians in the treatment of such injuries, no direct evidence that they were not prop-

erly placed on the arm by the doctor at the time. We have only the following showing as a basic fact upon which to conclude, deductively, that the fracture was not properly reduced, or that the proper appliances were not made to hold it in position after reduction: Some of the doctors called by the plaintiff testified that, from an examination of the X-ray pictures, the bone did not there appear to have been placed in proper apposition, and that the alignment was not perfect; and that this condition might be due to the manner in which the fracture was reduced in the first place, or to the manner in which it was treated after it was reduced.

There are authorities saying that, where the condition found upon an examination is of such a character, so out of harmony with conditions that ought to exist under proper treatment, a physician, seeing the result, may, as an expert, testify that the proper treatment was not administered, or such a result would not be found. Now it is true, as a general proposition, that the result furnishes no evidence of negligent treatment, but some cases may arise where evidence of the poor result alone might convince an expert that the treatment must have been improper. An opinion based upon such a showing would be competent evidence to establish the ultimate fact charged. But such a case is not before us here. The only expert called by the plaintiff who is shown to have been in a position to know just what the condition of the bone was after it had healed, and the manner in which the fracture was reduced, is Dr. Cremin, and he tells us that he found the bone in proper apposition, and properly healed; that the alignment was as good as you could expect, under the conditions which he found there. The only condition which he found that required treatment was the callus which nature throws out, and over which the attending physician has no control. It seems that an excessive amount of callus had been

thrown out around the wounded part. The excessive callus, as this record shows, may be due to many causes, none of which are under the control of the attending physician; and a careful examination of the X-ray pictures shows that the deformity appearing in the pictures is caused by the excessive callus, and when this was removed, the arm was left with all its functional properties normal. It is apparent that the plaintiff relies upon negligence—negligence of the attending physician in the treatment of the arm. It rests on the plaintiff, therefore, to show affirmatively that the condition of which he complains was due, at least in some measure, to the negligence of the physician, in respect to the matters relied upon as constituting negligence. A verdict to the effect that the doctor was negligent in reducing the fracture, or negligent in the treatment of the fracture after it was reduced, would rest, necessarily, upon mere speculation. The evidence pointed to no act of negligence on the part of the defendant. Every doctor who testifies or who assumes to say that the result was not perfect, tells us, in this record, that, even with the best treatment, with the fracture perfectly reduced, and proper bandages and appliances used to keep it in position, the condition here found might fairly be expected. There is no implied guaranty of results, and all the law demands is that the practitioner bring to the service of his patient and apply to the case that degree of skill and care, knowledge and attention, ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities; and it is the general holding of the courts that the bare fact that full recovery does not result, or that a surgical operation is not entirely successful, is not, in and of itself, evidence of negligence; and, in the absence of any showing from those learned in the profession that there was a failure to do that which ought to have been done in the treatment of the injury, or that there was that done which

ought not to have been done in the treatment of the injury,
there can be no recovery. The fact upon which negligence
is predicated must be shown, either affirmatively, by direct
evidence, or deductively, by conditions shown to exist after
the treatment. But, as said before, conditions, even though
they show bad results, are not, in and of themselves, suffi-
cient; but such results may form a basis upon which an ex-
pert, learned in the profession, may be permitted to base an
opinion that the operator failed in the full discharge of his
duty in the treatment of the case, or the results would not
appear as they are. We affirm that, in this record, there
is no testimony from any expert offered by the plaintiff af-
firming that the treatment made by the defendant was not
good, based upon the result as it actually existed, and was
actually found to exist by Dr. Cremin when he made the
incision baring the bone and finding its true condition. The
most that can be said of the experts who have testified for
the plaintiff is that, in their opinion, based upon an examin-
ation of the X-ray pictures, the bones were not in proper ap-
position; or, if originally placed in proper apposition, were
not held there by the treatment which the plaintiff received
at the hands of the defendant. But it also appears, from
the plaintiff's own expert, that these X-ray pictures do not
show the true condition of the bone, its position and align-
ment, as it was actually found by him when he made the
incision baring the bone, and do not show the true rela-
tionship of the radius to the ulna, and the true condition
of the fracture. Dr. Cremin's testimony leads the mind
to the conclusion that the only defect or deformity found was
due to the excessive callus adhering to the ulna; that, when
this was chiseled away, the arm was left with all its func-
tions perfectly normal. All the doctors say that the incision
is the last thing to be resorted to; that the closed method
should be followed, until it is conclusively shown that the
callus is not reducing itself in a natural way, and that rota-

tion cannot be brought about by manipulation. Then is the open method resorted to.

There is nothing in this record to show that, when the plaintiff ceased his treatments at the hands of the defendant, the period had passed when the doctor, in good judgment, should have resorted to the open method for relief. As said before, this is purely a fact case. There is no controversy as to the law. Upon the facts shown in this record, we feel that any verdict rendered by a jury would rest upon the merest speculation, and could find no support in any tangible fact shown by the plaintiff. A verdict for the plaintiff could not stand, upon this record, and the court was justified in directing a verdict for the defendant, and its action in so doing is—*Affirmed.*

PRESTON, C. J., LADD and STEVENS, JJ., concur.