KATHERINE COLEMAN, ADMINISTRATRIX, APPELLANT, v. NORTON L. WILSON, RESPONDENT.

Argued June 25, 1913—Decided November 17, 1913.

1. In an action against a physician for the death of a patient following an operation on his nose claimed to have been due to improper after-treatment, it appeared that the physician kept cutting away a tissue growth that formed in the nostril under the suspicion that it was a malignant growth. There was testimony tending to show that if it was not a malignant growth, but a normal product of the inflammatory process set up by the operation, its removal was not proper and might have caused the death. The court excluded a question asked an expert witness as to whether a reasonably prudent surgeon, if in doubt as to the nature of the tissue, would not have had a prompt analysis made. *Held,* that the exclusion of such question was error, as plaintiff was required not only to satisfy the jury that the tissue removed was in fact healthy tissue that should not have been disturbed, but also that its removal without ascertaining its real nature, or employing the means at the physician's command to that end by causing a pathological analysis, was negligence.

2. A physician, who held himself out as a specialist in the treatment of diseases of the nose, and who as such specialist was consulted by a patient upon the advice of an ordinary practitioner, was bound to exercise that degree of skill that such a specialist assumes to possess, and not merely the degree of skill and knowledge possessed by general practitioners.

On appeal from the Supreme Court.

For the appellant, *Lum, Tamblyn & Colyer.*

For the respondent; *Foster M. Voorhees.*

The opinion of the court was delivered by

GARRISON, J. This is an action under the Death act brought by the administratrix of Clarence E. Coleman, deceased. The defendant is a physician who made a specialty of diseases of the eye, nose, ear and throat, and who was consulted by the deceased concerning an obstruction in his left nostril, to remedy which an operation was performed by the defendant on September 15th, 1910.

This operation consisted in the separation of the turbinated bone from the septum or central partition of the nose to which it had become adherent, and the removal of portions of the bone together with some tissue that protruded from above into the nostril.

It is not claimed that this operation was unnecessary or that it was unskillfully performed or that *per se* it caused the death of the patient, which occurred eighteen days later from an inflammation of the coverings of the brain. It was, however, an indubitable fact that the patient died under the after-treatment conducted by the defendant, and that such after-treatment consisted in great part of the repeated cutting away by the defendant of a tissue growth that kept forming in the nostril at or near the site of the original operation. The defendant himself testified that when this growth kept coming back as fast as he cut it away, he "began to become suspicious it was a malignant growth," and thereafter continued to cut it away under that impression; and there was testimony that if the growth was malignant its removal was proper. There was, however, also testimony that if such growth was not malignant, but, on the contrary, was a normal product of the inflammatory process set up by the operation, its removal was not proper and may have been the efficient cause of the condition of which the patient died. A jury might so have found, for it was explained by expert medical testimony that the products of inflammation undergo

changes that render them capable of infecting adjacent tissues to which they may be carried, if not confined, to their original area, and that, as if to guard against this, the inflammatory process in part consists or results in the erection of a barrier against such extension of infecting matter by the rapid production of hypertrophied but healthy tissue (commonly called "proud flesh"), which serves to confine the infecting matter and to prevent its spread. In view of this testimony the jury might have found that the removal of this natural barrier was improper after-treatment which opened the way for the spread of the infection to the patient's brain.

It was also clearly a jury question under the testimony whether the rapidly forming tissue removed by the defendant was such a natural barrier or whether it was a cancerous growth as he suspected it to be.

The inference to be drawn from the testimony upon this subject was for the jury. It was not enough, however, for the plaintiff to satisfy the jury that the tissue removed by the defendant under the suspicion that it was malignant was in fact healthy tissue that should not have been disturbed; she must go further and show that it was negligence for the defendant to operate for the removal of this tissue without ascertaining its real nature or employing the means at his command to that end by causing a pathological analysis of such tissue to be made before continuing to remove it.

This was largely an expert question. When, therefore, counsel for the plaintiff called an expert specialist to the stand and put to him the crucial question: "Doctor, would a reasonably prudent surgeon, if in doubt as to the nature of tissue found on an examination by him, not have a prompt analysis made?" it was error to overrule such question.

The reason given by the court for the exclusion of this testimony was as follows: "You have wandered entirely from the issue made in this case. The issue in this case was that the treatment was improper and that the operation was improper." The exclusion of the proffered testimony upon this ground conclusively determined the conduct of the examin-

ing counsel who was not required and probably would not have been justified in persisting in the effort to get such testimony in, for, if this question was objectionable for the reason stated, so for the same reason would be any question upon the same topic. The practical result of this ruling was that the case went to the jury not upon the particular negligence which the plaintiff had sought to prove, but upon the general question of the failure of proper after-treatment. This was not an adequate presentation of the plaintiff's case, which was not that the failure of reasonably careful after-treatment caused the death of her decedent, but that the failure of the defendant to use reasonable care to ascertain the nature of the tissue that kept forming after the operation led to improper operative after-treatment which opened the way for or created the condition of which his patient died. The charge may have been proper in view of the exclusion of the evidence that was offered, but this only serves to emphasize the injurious effect of such exclusion which, being also erroneous, leads to a reversal of the judgment.

Another closely allied error was the refusal of the court to charge these requests of plaintiff's counsel: "1. Defendant acted as a specialist. As such he was bound to have that degree of skill and knowledge ordinarily possessed by specialists." "2. Defendant, as a specialist in this case, was bound to have a greater degree of skill and knowledge in the performance of the operation than that which a physician in regular practice is bound to have and exercise."

The object of these requests was to have the jury instructed as to the legal rule by which a specialist is held to a higher degree of skill than the ordinary general practitioner, and the operation fairly included after-treatment. Notwithstanding the requests, the court repeatedly told the jury that the defendant was only bound to exercise the reasonable care and skill of his profession both as to the operation and the after-treatment. Once the jury was told that the defendant was not liable "if he did everything which a careful, prudent physician *of his class* would have done," which was

immediately nullified by the additional words "or of his profession."

The pertinent rule to be gathered from the cases is correctly stated in 30 *Cyc.* 1571, as follows:

"A physician holding himself out as having special knowledge or skill in the treatment of particular diseases is bound to bring to the discharge of his duty to a patient employing him as such specialist, not merely the average skill and knowledge possessed by general practitioners, but that special degree of skill and knowledge possessed by physicians who are specialists in the treatment of such disease, in the light of the present state of scientific knowledge."

The case conclusively showed that the defendant held himself out as a specialist in the treatment of diseases of the nose, and that as such specialist he was consulted by the deceased upon the advice of the ordinary practitioner who had attended him. Under such circumstance, the question whether the defendant was a specialist, while one of fact, is primarily for his own determination, with the result that if he holds himself out as a specialist, it becomes his duty to bring to his patients that degree of skill that such a practitioner assumes to possess. *Baker* v. *Handcock,* 29 *Ind. App.* 456.

It was injurious error, therefore, to refuse to charge the plaintiff's requests unless the subject-matter thereof was correctly and substantially covered by the charge in language of the court's own choosing. *Aldrich* v. *Peckham,* 45 *Vroom* 711.

This was not done, and hence the refusal to charge the requests was an error that leads to a reversal.

The judgment of the Supreme Court is reversed.

*For affirmance*—None.

*For reversal*—The Chief Justice, Garrison, Swayze, Trenchard, Parker, Minturn, Vredenburgh, Congdon, White, Terhune, Heppenheimer, JJ.    11.