WALTER THORPE, Appellant, v. E. F. TALBOTT, Appellee.

**PHYSICIANS AND SURGEONS:** Negligence—Nonperfect Adjustment of Limb. The failure of a physician to make and maintain a *perfect* adjustment of a broken limb creates no presumption of negligence.

*Appeal from Poweshiek District Court.*—CHARLES A. DEWEY, Judge.

JANUARY 15, 1924.

ACTION at law, to recover damages from defendant, a physician and surgeon, for malpractice. At the close of plaintiff's evidence, the trial court sustained defendant's motion for a directed verdict. Plaintiff appeals.—*Affirmed.*

*Clyde McFarlin* and *Brockett, Strauss & Blake,* for appellant.

*J. H. Patton* and *Dutcher & McClain,* for appellee.

PRESTON, J.—The plaintiff and Dr. Ryan were the only witnesses called for plaintiff, except that a technician for the hospital gave evidence as to X-ray pictures of plaintiff's arm, taken some two months after plaintiff was hurt, and after treatment by the defendant.

Plaintiff is a well driller by trade. Defendant is a physician and surgeon, a resident of and practicing in the city of Grinnell. Plaintiff was injured August 30, 1920, by being struck on the arm by an iron lever. There was a fracture of the ulna in the right forearm, at about the juncture of the middle and upper third. The upper end of the lower fragment was displaced upward and inward, overriding the lower fragment three

fourths of an inch. There was a dislocation of the head of the radius bone forward. Plaintiff was taken to the hospital in Grinnell, where defendant undertook to treat the fracture. With the assistance of another doctor, an anesthetic was given, an X-ray taken, and the arm splinted. The next day, plaintiff was again put under an anesthetic, and defendant made an incision in the arm, and a Lane plate was applied to the ends of the bone, the wound closed, and the arm placed in a cast. Two screws were used in applying the plate to the bone, one in each end of the plate. For twelve days, plaintiff remained in the hospital, and was seen daily by the defendant. On the tenth day after the operation, defendant took the bandage off that was around the plaster-paris splint, opened the splint, took out the stitches, and put the bandage, cast, and wrappings back on again. A day or two later, plaintiff wanted to go home, and defendant advised him that he could do so, but, if he had any trouble or pain, to go and see a doctor; that, if there was no extra pain, plaintiff would be all right, and to return to Grinnell for examination in six weeks. Plaintiff went home, where he remained six weeks without suffering any unusual pain. He then went back to Grinnell, and defendant removed the cast, manipulated the arm a little, and bent the elbow some. Plaintiff says he saw the naked arm at that time, and as far as he could see, it looked all right, and that defendant told him that he thought the union would get hard enough and solid enough so that, in about four weeks, plaintiff could go to work, and he says, "I went on my way rejoicing." Plaintiff does not claim that there was any soreness at that time, or that his arm was causing any pain or discomfort. Defendant told plaintiff then that the arm was healed. From there plaintiff went to the depot, and then to Des Moines. This was on Friday. He stayed at his brother's until Sunday, when the arm gave him some trouble. He first phoned to Dr. Talbott, and secured his permission to consult Dr. Charles Ryan, of Des Moines. When Dr. Ryan first examined the arm, he found it red and swollen. It was quite tender and sore. The soreness was more marked at one place. Plaintiff had a temperature, and Dr. Ryan concluded that there was infection. Dr. Ryan made an incision through the line of the old scar which had healed, and got drainage of the pus,

and applied dressings. This resulted in a reduction of the swelling and a practical disappearance of the redness and tenderness. A week later, Dr. Ryan sent plaintiff to the hospital for the purpose of removing the plate. At this time, Dr. Ryan found the two screws in the plate; the plate was loose; and the bones were dislocated, or they had slipped, permitting the bones to override slightly. The plate was removed, the bones placed in apposition, holes drilled in the end of each fragment, and they were tied together with kangaroo tendon. Dr. Ryan testified that, with the plate in the face of the infection, the arm would not heal, and he therefore removed the plate. Plaintiff remained under Dr. Ryan's care from that time, November 1st, till May, 1921.

It is contended by appellee that plaintiff's arm was in good condition when defendant last saw it, and that, on the following Sunday, an entirely different situation was presented, when Dr. Ryan saw it; that plaintiff had pain in the meantime, and his arm had become swollen and inflamed, tender and sore, and the head of the radius dislocated, or it had slipped, and that there is no evidence as to what happened to plaintiff after defendant last saw the arm and before plaintiff saw Dr. Ryan; that, before the jury could find that the conditions found by Dr. Ryan were the result of unskillfulness of the defendant, and that plaintiff was free from contributory negligence, defendant was entitled to have evidence from the plaintiff that he had suffered no injury in the meantime.

The argument is in two main divisions. The first division relates to the sustaining of defendant's objections to offered testimony on the examination of Dr. Ryan.

1. Appellant sought to show by Dr. Ryan that he was familiar with the practice of medicine and surgery, methods used and skill had by members of the profession in towns and communities similar to Grinnell. Appellee contends that the assignments of error in reference thereto may not be considered, because neither the assignments nor the brief points refer to any particular question or to any page in the abstract where the error may be found, and that, therefore, the assignments are too general. They are quite general and indefinite. However, after examining the record, we are inclined to think that the

trial court did restrict the examination somewhat in this regard. Still, Dr. Ryan was permitted to say that he had visited other towns in the state similar to Grinnell professionally,—Waverly, Winterset, Ogden, Boone, and probably a few others; that he met physicians and surgeons in those towns, and observed their practice and methods to some extent; that he met, in his own office in Des Moines, physicians and surgeons from towns similar to Grinnell, and talked with them and advised them about their cases, and in that connection and in those meetings had an opportunity to observe their methods and their knowledge of their profession. We deem it unnecessary to go into this matter, since, upon the whole record, we reach the conclusion that, for reasons other than this, the trial court properly directed a verdict.

2.   The vital point in the case is whether the undisputed evidence was such as to show negligence on the part of the defendant, or rather, whether there was any evidence to justify the trial court in submitting that question to the jury. We are of opinion that, under the undisputed evidence, negligence was not shown. The doctor testified that he did not consider the result good, because of the complications. We shall refer as briefly as may be to the complications. Though other grounds of negligence were alleged, plaintiff's only expert witness, Dr. Ryan, a physician and surgeon of experience, did not criticise anything defendant did, except to express a general opinion that, in the ordinary general run of fractures at this location of the forearm, two screws would not be sufficient to hold the plate in position. But, on cross-examination, the witness testified that the number of screws that should be in the Lane plate is largely a matter of judgment upon the part of the physician who has the wound open before him and observes the character of the fracture, whether it is an oblique or a transverse fracture, or whether it is a fracture that is broken so that the ends dovetail in together.

"Q. And it also depends upon whether it is a long bone, without any lateral bone, or whether there are two bones, as there was in the forearm,—one bone acting to some extent as a splint for the other? A. Yes, sir; that is taken into consideration."

Dr. Ryan also testified that he found an infection, and drained the pus; that he could not determine what occasioned the infection; that, if the plate became loosened, it would irritate and aggravate the condition.

"Q. Now, with reference to the loosening of the Lane plate, I will ask you if it is not true that one of the principal and most frequent causes of the loosening of the plate is infection. A. Yes, sir; in many instances the infection precedes the loosening of the plate, and causes the loosening. Q. And, of course, infection is a matter that may occur in a case of this character, in the face of the exercise of the highest degree of skill and care on the part of the surgeon attending,—isn't that true? A. Yes, sir. In a fracture of this character, there is a tendency for dislocations to recur. Q. And if the dislocation of the radius had been reduced, and there had been a subsequent infection and a loosening of the plate and a dropping down of the fragments, as shown in the picture you had taken, there would be a probability of the radius being again dislocated, would there not? A. Yes, sir. Q. So that it is impossible to tell from these X-rays and from what you know about it whether the head of this radius, the dislocation, had been reduced when Dr. Talbott first saw it or not? The simple fact that it was out when you saw it, under the conditions, would not tend to prove that it was not properly reduced in the first instance? A. No; you could not say whether it was or not. Q. And you are not prepared to say, Doctor, that it was unskillful or negligent for the attending surgeon in this case, based upon what you know of the case and what you saw of the case, in the light of what he saw and what he knew when he applied the Lane plate,—you would not say it was unskillful or negligent to apply the plate with two screws, instead of more? A. I could not logically say that, because of the fact of the lapse of time that had taken place between the time Dr. Talbott saw the case and when I saw it, and I knew not what the conditions were when he saw it. Q. Not knowing what the conditions were when he saw it, of course you would not pass judgment upon what should have been done, without knowing the conditions, could you? A. No."

Dr. Ryan testified that the after treatment in a fracture of this character was rather a difficult question to answer, but

said that, in a general way, the after treatment of the fracture of the ulna, as well as of all fractures, is to observe and examine them frequently, and ascertain, in so far as possible, the condition of the fractured bone and limb, and make every attempt and effort possible to maintain the reduction as it was reduced.

"Not saying you can always do that, because in some instances it is quite impossible to do that, probably. But the after treatment of the injury would really consist in watching your dressing and watching the splints and seeing that they were giving proper support, or having proper supportative effect, and readjusting them, etc., if it became necessary."

Some other questions were asked the doctor in reference to the after treatment; but he had the history of the case, and what had been done by the defendant, and his answers before set out covered the entire case, and he said that he could not say there was any unskillful treatment.

We have not, of course, attempted to set out all the evidence. Such as has been set out was plaintiff's own evidence, and is not disputed. Plaintiff suffered a severe fracture. The evidence would not justify the jury in finding that the bones were not in normal position as they should have been when defendant last examined the plaintiff, or that the result would not have been good, except for the complications before referred to, and would not justify it in finding that defendant did not possess and exercise the degree of skill required, thereby causing injury to plaintiff. The result is not, in itself, evidence of negligence, nor does the mere failure to cure raise a presumption of negligence. We deem it unnecessary to review the cases again. We are of opinion that our conclusion is supported by the following, among other authorities which might be cited. *Snearley v. McCarthy*, 180 Iowa 81; *Whitesell v. Hill*, 101 Iowa 629; *Tomer v. Aiken*, 126 Iowa 114.

Without prolonging the opinion, we are of opinion that the judgment ought to be affirmed. It is—*Affirmed.*

ARTHUR, C. J., STEVENS and FAVILLE, JJ., concur.