JOHN F. McGULPIN, appellant, v. DR. WM. G. BESSMER and DR. GEO. M. MIDDLETON, a copartnership, and DR. WM. G. BESSMER, individually, appellees.

No. 47594.

(Reported in 43 N.W.2d 121)

JUNE 13, 1950.

REHEARING DENIED OCTOBER 23, 1950.

Bach & Arnett, of Hazard, Kentucky, for appellant.

Lane & Waterman and Cook, Blair & Balluff, all of Davenport, for appellees.

GARFIELD, J.—The first count of plaintiff's amended petition charges defendants, Drs. Bessmer and Middleton, and their employee, Dr. Spang, with want of due care, skill and knowledge in treating varicose veins in plaintiff's leg, resulting in gangrene and amputation of the leg. The second count alleges defendants and Dr. Spang, following an operation on plaintiff's leg, abandoned and without cause failed to treat him, so amputation of the leg was necessary.

A separate count in a supplemental petition alleges Dr. Spang, without due care and skill and by a gross technical error, mistakenly ligated and cut the *artery* in plaintiff's leg instead of the *vein*; this cut the blood supply to the leg, resulted in gangrene and subsequent amputation.

Defendants' answer admits Dr. Spang was their employee

and that he performed a ligation operation on the vein of plaintiff's leg but denies other allegations of plaintiff.

At the conclusion of plaintiff's evidence a verdict for defendants was directed on the grounds "the record fails to show any standard of skill or diligence customarily used in Davenport or similar localities or that defendants did not exercise that degree of skill and diligence that was standard in this community and fails to show any negligence." The court ruled there might be a question whether defendants abandoned plaintiff but such abandonment was not the proximate cause of amputation since the necessity of amputation had been determined on June 22 and since it was ten days after plaintiff was removed to Iowa City before the doctors there deemed amputation proper. The court also ruled the doctrine res ipsa loquitur did not apply to the facts under consideration.

Of course plaintiff is entitled to the most favorable construction of which the evidence is fairly susceptible. Wilson v. Corbin, 241 Iowa 593, 596, 41 N.W.2d 702, 704, and citations.

On May 25, 1939, plaintiff, a machinist then fifty-five, went to the office of defendants in Davenport and asked for injections for varicose veins in his legs. He went to defendants because he had been told they were the big industrial doctors there and were specialists. On plaintiff's second visit Dr. Bessmer, whom plaintiff wanted to see, turned him over to Dr. Spang, a young assistant in defendants' office, with the assurance Dr. Spang was an expert on treatment of varicose veins.

Dr. Spang told plaintiff the injection method was obsolete, futile and endless and the modern method was ligation by which an incision was made in each groin, the veins were tied at the knees and taken out. To plaintiff's inquiry whether such an operation was dangerous Dr. Spang assured him, "Hell no, we can do it in 15 minutes in the office." Plaintiff asked if he would lose time from work and was told he would not.

As directed, plaintiff returned to defendants' office the next day and was then instructed to report the following morning to Mercy Hospital. Plaintiff objected to going to a hospital but Dr. Spang said, "Don't be foolish. You won't have to stay there over a half hour and can go home and about your business." Actually, the operation on June 9, 1939, *on only one leg* "started

about 9 or 9:30 and it was after 12 when completed." When the outer vein had been removed from plaintiff's right leg Dr. Spang announced, "We had better let the other leg go until we see how this turns out." He said "he didn't know how it was going to turn out. Maybe I am in an awful fix." This prophesy proved more accurate than Dr. Spang's previous assurances.

Dr. Spang then told plaintiff he could not go home till mid-afternoon. A few minutes later the doctor said, "Now that we have you here we are going to keep you." Plaintiff was kept in the hospital four days and then taken home on a stretcher. "Before I got home my leg was a little blue and swelling. * * * After I got home the whole foot turned black. I was in such misery I couldn't stand it and my wife called the doctor." Dr. Spang then called on plaintiff almost daily and after a week at home on June 20 ordered plaintiff's return to the hospital in an ambulance.

On June 22 Dr. Bessmer told plaintiff, "We are going to have to take that *foot* off *right away*." When plaintiff went "up in the air" and accused Dr. Bessmer of making him a cripple the doctor made no denial of the charge but assured plaintiff he (Bessmer) would see that plaintiff got steady work at French & Hecht's. "At that time he also promised me an artificial foot." After June 23 neither defendants nor Dr. Spang saw plaintiff again. There is no explanation of this.

Before defendants last saw their patient and thereafter his leg had turned purple, and in places black with white strings through it. It "was swollen quite a bit" and felt like it was on fire. Plaintiff could scarcely endure the pain and frequent "hypos" were necessary. On June 27 the county doctor, whom plaintiff did not know, evidently felt sorry for plaintiff and arranged for him to be taken to the State University Hospital at Iowa City where his *leg* was amputated on July 7 below the knee and on July 27 at mid-thigh. He was released from the University Hospital August 13.

Amputation of the leg was necessary because of gangrene caused by occlusion (blocking) of the femoral artery which carries blood to the leg. The evidence shows there are four possible causes of such occlusion:

1) Ligation (tying) of the artery (not the vein);

2) Injury to the artery (Dr. Fowler refers to this as spasm due to injury);

3) Embolism (a floating clot) in the artery; and

4) Thrombosis (stationary clot) in the artery.

Dr. Dorner (who performed both amputations) and Dr. Fowler testify embolism probably did not cause this occlusion. There is no contrary testimony. Dr. Fowler says:

"As to how a thrombus would occur in an *artery* when you are operating on the *vein*, I would say if the artery was damaged at the time the patient was operated on a thrombus might be formed. As to any other way it could be caused I would say, very rarely—once or twice in three or four thousand operations. * * * There is usually a history of trauma in connection with thrombus because * * *. A blood clot in an artery in this kind of case is rare. A clot in the vein is rather common."

It is true Dr. Fowler would not say for a certainty that if a thrombus caused the occlusion it was traumatic in origin.

Dr. Dorner testified, "I would say the probability of thrombosis occurring in a femoral artery after saphenous vein ligation is quite rare." This evidently refers to thrombosis as a coincidence, unaccompanied by prior injury to the artery.

The jury could properly find the occlusion of the artery which produced gangrene in plaintiff's leg was caused either by ligation of the artery as a result of mistake or injury thereto during the operation by Dr. Spang when "there were black and blue finger marks up and down my thigh and it felt like he was tearing the whole inside of the leg out."

Dr. Dorner says, "There is a distinct difference between the artery and the vein so that one should be able to identify the difference." As stated, the artery carries blood to the leg. The veins return blood from the leg to the heart. Dr. Dorner also testified, "Gangrene does not normally follow from such an operation." It is true Dr. Dorner was unwilling to say for certain what caused the occlusion of plaintiff's artery.

I. Plaintiff argues the trial court erred in not applying the doctrine of res ipsa loquitur. Paragraph 7 of Count I of plaintiff's amended petition contains specific charges of negli-

gence. We have held res ipsa loquitur may not be invoked in aid of such charges. Eaves v. City of Ottumwa, 240 Iowa 956, 972, 38 N.W.2d 761, 770, 11 A. L. R.2d 1164, 1178, and citations.

As stated, a separate count in a supplemental petition alleges the gangrene in plaintiff's leg resulted from Dr. Spang's negligent and unskillful act in ligating the artery rather than the vein. As eminent counsel for defendants seem to concede in Division I of their argument, this is a general charge of negligence and if there is evidence Dr. Spang mistakenly ligated the artery rather than the vein plaintiff would be entitled to the benefit of res ipsa loquitur in support of this charge. See Whetstine v. Moravec, 228 Iowa 352, 374–382, 291 N.W. 425, and citations. Defendants concede these decisions are in point if the artery were ligated: "These cases would be in point only if it had been established Dr. Spang had severed the artery while working on the vein. * * * Given proof the artery was severed the want of care and skill can be inferred * * *."

II. Since there should be a reversal because of failure to submit the charge of abandonment and since the evidence upon a retrial may be different, it is perhaps unnecessary to pass on the sufficiency of the evidence to warrant submission to the jury of plaintiff's claim aside from abandonment. It may be conceded the evidence is not strong. But it seems sufficient, in the absence of explanation from defendants, for submission to the jury.

As stated, a finding would be warranted that the cause of the gangrene was either mistaken ligation of the artery, or injury thereto, by Dr. Spang. One of these causes, both chargeable to Dr. Spang, seems probable, not merely possible, and more probable than any other cause based on the evidence. It is not necessary the proof be conclusive or exclude every other suggested or possible cause. Bartholomew v. Butts, 232 Iowa 776, 783, 5 N.W.2d 7, 11, and citations; Woronka v. Sewall, 320 Mass. 362, 69 N.E.2d 581, 582, 583, and citations.

It is clear that if the artery rather than the vein was ligated a finding of negligence in so doing would be proper. Defendants do not argue otherwise. That injury to the artery in the course of removing the vein was the result of lack of care or skill is perhaps not so plain. But such a finding would also seem justified. Dr. Bessmer's failure to deny plaintiff's charge

that defendants made him a cripple and his assurance he would see plaintiff got steady work and furnish him an artificial foot is in the nature of an admission which aids plaintiff's case.

Whetstine v. Moravec, supra, 228 Iowa 352, 361, 365, 291 N.W. 425, 429, holds defendant's statement, "we will see you through all this," was an admission which lends some assistance to plaintiff. Admissions of a physician, when not mere statements of regret or sympathy, are sufficient in themselves to take a case of this kind to the jury. Woronka v. Sewall, supra, 320 Mass. 362, 69 N.E.2d 581.

III. The claim defendants abandoned plaintiff should have been submitted to the jury. It is undisputed that about nine a.m. on June 22 Dr. Bessmer told plaintiff, in the hospital under defendants' care, "We are going to have to take that *foot off right away.* * * * You let me take that foot off as far as the knee joint, and with an artificial foot you will be able to work, and I will see that you get steady work at French & Hecht's." Plaintiff further says, "When he talked to me that morning he said he was going to take the foot off. * * * he also promised me an artificial foot, and I said 'Well, regardless of promises, I suppose if the foot has to, it has got to come off.'"

So far as shown, neither defendants nor Dr. Spang ever retracted the above statement. Plaintiff testifies, "I did not see him [Dr. Bessmer] after the 23d. * * * Between the 23d and 27th I did not see Drs. Spang, Middleton or Bessmer. I had not dismissed them or permitted them to substitute any doctor in their place and was willing to continue their treatments."

Dr. Bessmer's statement, in the light most favorable to plaintiff, is substantial evidence of plaintiff's critical condition and the propriety and urgent necessity of immediate amputation of the foot. Further, it is an assurance plaintiff would be able to work steadily if his foot and perhaps part of the leg were *then* amputated *below the knee joint.* Dr. Bessmer's statement fairly implies that if the foot were amputated below the knee joint "right away" further amputation would be unnecessary.

There is no explanation for the failure of Drs. Bessmer and Spang to see plaintiff after June 23d. And nothing was done to remove the foot on the 23d. Plaintiff told the county doctor

on June 27, "You can't seem to get hold of those doctors [defendants and Dr. Spang]. My wife has called them up."

The finding is warranted plaintiff was not taken to the University Hospital in Iowa City until he had reason to feel defendants had discontinued treating him. Plaintiff was in almost unbearable pain and naturally believed from Dr. Bessmer's statement an immediate operation was necessary. He was under no duty to wait indefinitely for defendants to give him attention. After plaintiff was taken to Iowa City it was necessary to amputate not only the foot but the leg six inches below the knee and, upon recovery from that operation, to amputate at mid-thigh.

When a physician takes charge of a case his employment continues until ended by mutual consent or his dismissal or until his services are no longer needed. A physician who leaves a patient in a critical stage of the disease without reason or sufficient notice to enable him to procure another physician is guilty of culpable dereliction of duty for which he is liable. Stohlman v. Davis, 117 Neb. 178, 220 N.W. 247, 60 A. L. R. 658, and annotation 664; Bolles v. Kinton, 83 Colo. 147, 263 P. 26, 56 A. L. R. 814, and annotation 818; Herzog Medical Jurisprudence, section 188; 41 Am. Jur., Physicians and Surgeons, sections 72 and 102; 48 C.J., Physicians and Surgeons, sections 115 and 116. See also Mucci v. Houghton, 89 Iowa 608, 611, 612, 57 N.W. 305; Gillette v. Tucker, 67 Ohio St. 106, 65 N.E. 865, 868, 869, 93 Am. St. Rep. 639, 13 Am. Neg. Rep. 421.

Defendants argue it is fatal to plaintiff's claim of abandonment that no expert testifies it would have been proper to amputate the foot on June 22 or before June 27 when plaintiff was taken to Iowa City. The argument would have merit if it were not shown Dr. Bessmer on June 22 told plaintiff immediate amputation of the foot was necessary. Defendants are not in position to contend plaintiff should have produced expert testimony to corroborate Dr. Bessmer's statement.

The trial court's ruling, which defendants commend to us, is that Dr. Bessmer's statement on June 22 was evidence amputation was then necessary and "any abandonment of plaintiff by defendants was not a proximate cause of the necessity for amputation since that had been determined before the claimed abandonment." This ignores the fact Dr. Bessmer had decided it

was only necessary to amputate below the knee joint, whereas when plaintiff was at Iowa City amputation of the leg at the thigh had become necessary. The jury could properly find that if, as Dr. Bessmer said was then necessary, defendants had amputated below the knee joint "right away," further amputation at the thigh would not have been required. Obviously loss of the leg is more serious than loss of the foot. The trial court's ruling also ignores the added pain and suffering because of the delay and removal of the leg at the thigh. See as having some bearing Wilson v. Corbin, supra, 241 Iowa 593, 602, 603, 41 N.W.2d 702, 707, 708, and citations.

IV. Since the cause is reversed and may be retried and in order that error may be avoided it seems desirable to express our views upon the trial court's ruling that Dr. Fowler of Evanston, Illinois, was not a competent witness to testify to the methods of treating varicose veins and whether the blocking of the femoral artery could be repaired. This is a matter argued by both sides.

Dr. Fowler acquired an A.B. degree from Williams College, Massachusetts. He then attended Northwestern University medical college, Evanston, four years. From March 1941 to June 1942 he was interne at the University of Illinois research hospital, Chicago. The next year he was a surgical research fellow at the University of Illinois and received a master of science and surgical degree. He was resident surgeon for the University of Illinois hospital for three more years and was then associated with Dr. DeTacket of Chicago. Dr. Dorner indicates Dr. De-Tacket is an eminent specialist in vascular surgery (treatment of varicose veins, clots, high blood pressure and the like). For about three years just before the trial in 1949 Dr. Fowler was on the staff of an Evanston hospital. He has had a rather broad training in surgery, especially vascular surgery, and performed three or four hundred ligation operations of the saphenous vein. About September 1947 Dr. Fowler examined plaintiff who was probably referred to him by Dr. DeTacket.

Dr. Fowler testifies without dispute:

"I am familiar with the care, skill and knowledge of physicians and surgeons in communities generally throughout the country, similar to Davenport, in the treatment of varicose veins

for the year 1939. I have received this knowledge and experience through my training in medical school, as an interne, a resident surgeon, my work for Dr. DeTacket and my own private practice. \* \* \* I have given treatment of varicose veins in similar communities as that of Davenport."

Principal grounds for the ruling Dr. Fowler was incompetent seem to have been that he had practiced mostly in and around Chicago (about one hundred seventy-five miles from Davenport) and he was still in medical college in 1939 when defendants treated plaintiff.

We have said several times a physician is bound to use that degree of knowledge, skill, care, and attention ordinarily exercised by physicians under like circumstances and in like localities. Bartholomew v. Butts, supra, 232 Iowa 776, 779, 5 N.W.2d 7, 9, and citations; Wilson v. Corbin, supra, 241 Iowa 593, 599, 41 N.W.2d 702, 705.

The thought behind these statements apparently is that there may be a different standard of care or method of treatment in different localities. Decisions show a definite trend away from this thought, especially where the locality in question is such a city as Davenport in a metropolitan area (including a portion of Illinois) of some 200,000 people, only three or four hours ride from a great city like Chicago.

For example, in Sinz v. Owens, 33 Cal.2d 749, 757, 205 P.2d 3, 7, 8 A. L. R.2d 757, the California Supreme Court says:

"The more recent California cases upon the question of competency of a doctor in one community to testify as to the standard of care at another place, although phrasing the rule in terms of 'same' or 'similar' locality, have shown a clear tendency to depart from the earlier geographical limitations of the rule."

Sampson v. Veenboer, 252 Mich. 660, 666, 667, 234 N.W. 170, 172, holds a Chicago doctor was qualified to testify to the practice of surgery in Grand Rapids, Michigan, although he had retired from active practice before the time in question and (to quote from the opinion), "He never visited the hospitals or practiced \* \* \* in \* \* \* Michigan." Grand Rapids and the Davenport

area are very nearly the same distance from Chicago, with about the same population. The Sampson opinion further states:

"At times it may become necessary to secure the expert testimony of one who resides some distance from the home of a defendant accused of malpractice, for it may be difficult to obtain a witness to testify against one who bears the very high professional reputation of defendant. If it would always be necessary to secure an expert from the vicinity of the home of a defendant who might be the only practitioner there, it would be impossible to secure such testimony at all. What credence should be given to the expert's statements is another matter. That was the province of the jury."

Like the Michigan court and several others we have commented on the well-known natural reluctance of physicians to testify in malpractice cases against a fellow doctor, especially a reputable one. Bartholomew v. Butts, supra, 232 Iowa 776, 779, 5 N.W.2d 7, 9, and citations.

In Viita v. Fleming (Viita v. Dolan), 132 Minn. 128, 135, 155 N.W. 1077, 1080, 1081, L. R. A. 1916D 644, Ann. Cas. 1917E 678, widely approved in other jurisdictions, the Minnesota court as early as 1916 rejected the rule that a physician is to be judged only by the qualifications that others in the same village or similar villages possess and adopted the rule that a doctor is (to quote from the opinion) "required to exercise such reasonable care and skill as an ordinary physician or surgeon in good standing would exercise under like circumstances, and that, among the circumstances to be considered, was the *location* of the physician * * *."

Another leading case is Tvedt v. Haugen, 70 N. D. 338, 349, 294 N.W. 183, 188, 132 A. L. R. 379, cited with approval in Wambold v. Brock, 236 Iowa 758, 764, 19 N.W.2d 582, 585, and in Wilson v. Corbin, supra, 241 Iowa 593, 602, 41 N.W.2d 702, 707. Tvedt v. Haugen states:

"Today, with the rapid methods of transportation and easy means of communication, the horizons have been widened, and the duty of a doctor is not fulfilled merely by utilizing the means at hand in the particular village where he is practicing. So far as medical treatment is concerned, the borders of the locality and

community have, in effect, been extended so as to include those centers readily accessible where appropriate treatment may be had which the local physician, because of limited facilities or training, is unable to give."

See also Flock v. J. C. Palumbo Fruit Co., 63 Idaho 220, 118 P.2d 707, 715, 716; Hodgson v. Bigelow, 335 Pa. 497, 7 A.2d 338, 344, both cited in Wilson v. Corbin, supra (at page 600 of 241 Iowa, page 706 of 41 N.W.2d).

3 Shearman and Redfield on Negligence, Rev. Ed., section 617, page 1532, says:

"The rule is not such skill as is possessed by medical men in the same locality * * *. But * * * such skill as capable members of the profession ordinarily possess under similar circumstances, having regard to similar localities and the opportunities they afford for keeping abreast with the advance in medical knowledge and science."

Restatement of the Law, Torts, section 299, comment d, page 805, states: "In those professions which can be safely practiced only by persons who have been trained thereto, one * * * is required to have the skill normal to the average member of the profession." This does not limit the required skill to that in the same or like localities.

The above sufficiently indicates the trend of the authorities. There seems to be sound basis for holding a physician to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances. And the locality in question is merely one circumstance, not an absolute limit upon the skill required.

But even under the rule which has prevailed in this state Dr. Fowler was shown competent to testify to the methods of treating varicose veins in localities like Davenport and whether the blocking of the femoral artery could be repaired. He should not have been held incompetent merely because he had practiced mainly in and around Chicago or because he was still a medical student in 1939. Perhaps Dr. Fowler could not have testified to such methods of treatment by a small-town general practitioner. This is not such a case.

Nothing more need be said as to the metropolitan character of the Davenport area and its proximity to Chicago. Defendants'

argument refers to the Davenport hospital where plaintiff was confined as a "metropolitan" one. Further, it is to be remembered Dr. Bessmer held out Dr. Spang to plaintiff as an expert or specialist in the treatment of varicose veins and plaintiff had a right to believe he was more skillful in such matters than the ordinary general practitioner. It is not unreasonable to expect a specialist in a particular field located in a city like Davenport to be informed of methods in use outside the city where he is located.

 A physician or surgeon who is held out as a specialist is required to exercise that degree of skill and care ordinarily used by similar specialists in like circumstances, having regard to the existing state of knowledge in medicine and surgery, not merely the average skill and care of a general practitioner. Rayburn v. Day, 126 Or. 135, 268 P. 1002, 59 A. L. R. 1062, and annotation 1071; Coleman v. Wilson, 85 N. J. Law 203, 88 A. 1059, Ann. Cas. 1915D 1122, 1124, and note; Baker v. Hancock, 29 Ind. App. 456, 63 N.E. 323, 325, 64 N.E. 38; Gabrunas v. Miniter, 289 Mass. 20, 193 N.E. 551; annotation 141 A. L. R. 111, 119, 120; 41 Am. Jur., Physicians and Surgeons, section 90.

For the errors pointed out in Divisions II and III, this cause is—Reversed and remanded.

BLISS, C.J., and OLIVER, HALE and MULRONEY, JJ., concur.

SMITH, J., concurs in Divisions III and IV and in the result.

HAYS, WENNERSTRUM and MANTZ, JJ., dissent.

HAYS, J. (dissenting)—I respectfully dissent.

Action for damages for malpractice, and, being a law action, it is before this court solely for the correction of assigned errors. Rule 334, Rules of Civil Procedure. A verdict having been directed at the close of the appellant's testimony, he is entitled to have the same reviewed in its most favorable light. Roth v. Headlee, 238 Iowa 1340, 29 N.W.2d 923.

Four errors are assigned: (1) Failure to submit the res ipsa loquitur doctrine (2) sufficiency of the evidence to raise a jury question (3) failure to submit the question of abandonment to the jury, and (4) refusal to permit Dr. Fowler to testify as to the standard of care and treatment in the Davenport area.

Appellant's petition asserts three grounds of negligence as a basis for recovery of damages: (1) Failure to exercise the proper care, skill and knowledge of the ordinary, prudent, average physician and surgeon in the performing of the operation (2) mistaken ligation of the femoral artery instead of the saphenous vein, and (3) abandonment of appellant by appellees after the operation, which was the direct and proximate cause of the necessity for the amputations.

The majority opinion rejects the res ipsa loquitur doctrine on a basis of pleading, with which I agree, but irrespective of the pleading, in my judgment, the doctrine is not applicable under the facts in the case. Eisentrager v. Great Northern Ry. Co., 178 Iowa 713, 160 N.W. 311, L. R. A. 1917B 1245; Gebhardt v. McQuillen, 230 Iowa 181, 297 N.W. 301; 38 Am. Jur., Negligence, section 301.

The trial court held that Dr. Fowler was incompetent to testify as to the standard of skill in the Davenport area and this is assigned as error. While I am inclined to agree with the majority holding that Dr. Fowler should have been allowed to testify on this question, no error can be predicated upon this ruling, since no proffer of proof was made. McKinney v. Clark Brown Grain Co., 232 Iowa 1235, 7 N.W.2d 798; 4 C. J. S., Appeal and Error, section 294(c).

Appellant asserts that the evidence is sufficient to raise a jury question as to the lack of skill and as to the ligation of the femoral artery, and the majority opinion would seem to agree. Upon a careful examination of the record I am unable to agree, and feel that there is no merit in this assigned error. It is fundamental that no negligence can be considered by the jury in arriving at a verdict except the negligence which is charged in the petition. O'Grady v. Cadwallader, 183 Iowa 178, 166 N.W. 755. The issues thus presented—lack of skill and mistaken ligation—are highly technical ones, regarding which the average layman, or juror, even though he be of the highest intelligence, can have but little, if any, independent knowledge. The courts generally recognize the fact that the correct treatment and probable results are scientific questions and the alleged malpractice in any case must be substantiated by the testimony of expert witnesses. It is the province of experts, physicians and surgeons,

to say whether the treatment and acts of an attending physician in any case were or were not proper. Snearly v. McCarthy, 180 Iowa 81, 161 N.W. 108; Whetstine v. Moravec, 228 Iowa 352, 291 N.W. 425; Bartholomew v. Butts, 232 Iowa 776, 5 N.W.2d 7; 41 Am. Jur., Physicians and Surgeons, section 129. No presumption of negligence or want of due skill arises from the mere fact that the treatment given was unsuccessful or failed to produce the best results. Piles v. Hughes, 10 Iowa 579; Thorpe v. Talbott, 197 Iowa 95, 196 N.W. 716. The plaintiff has the burden of showing a breach of duty. O'Grady v. Cadwallader, supra. To recover for malpractice the evidence must make plaintiff's theory of cause of injury reasonably probable and more so than any other hypothesis (Ramberg v. Morgan, 209 Iowa 474, 218 N.W. 492), although it is not necessary that the proof be conclusive nor exclude every other suggested cause or possible theory. See Bartholomew v. Butts, 232 Iowa 776, 5 N.W.2d 7.

As to the questions involved in this assigned error, appellant called two expert witnesses, Dr. Edison F. Fowler, who first saw appellant in 1947, and Dr. Ralph A. Dorner, who performed both amputations.

Dr. Fowler stated, in part:

"There was a block of some type in the femoral artery at the point where the ligation was done. Generally there are several possibilities as to the cause of the block. It may have been caused by an embolus. * * * The other possibility is that the patient might have had a thrombosis. * * * There is another possibility that it was due to a spasm. * * * The other possibility is of course that the artery might have been tied. * * * It is possible in a ligation operation that a thrombus would have been caused in an artery. * * * The femoral artery and femoral vein are within two or three millimeters of each other. The saphenous vein joins the femoral vein and consequently it is very close to the artery, also. * * * As to how a thrombus would occur in an artery when you are operating on the vein, I would say that *if* there was damage done to the artery at the time the patient was operated on, a thrombus might be formed. * * * As to any other way that it could be caused, I would say, very rarely; it might occur spontaneously as a coincidence. As a coincidence it might

occur one or two times in three or four thousand operations. * * * The fourth possibility is mistaken ligation. * * * It is theoretically possible that the saphenous vein might have been mistaken for the artery. * * * I think you can rule out the possibility of spasm * * *. I think you can pretty well rule out the possibility of the embolus. * * * I therefore would consider it would have to be one of two possibilities in this case, either thrombus locally or possible ligation, and I don't think you can rule out definitely which of the two possibilities it is. I cannot say that the thrombus was traumatic in origin * * *."

Dr. Dorner stated, in part:

"The femoral artery had been occluded in all probability * * * whether it was by surgery, thrombosis or embolism I can't state, because I didn't examine the site of the previous operation. I would say that the probability of thrombosis occurring in a femoral artery after saphenous vein ligation is quite rare. * * * The occlusion of the femoral artery could result from a variety of causes * * * I think that it is true that embolisms may form without being attributable to any particular cause. It is usually either a damaged vessel due to arteriosclerotic changes, or due to disease within the vessel or the heart that is usually responsible. * * * I think the main cause of the gangrene was the occlusion of the femoral artery. There would be a multiplicity of causes. * * * I was not aware of the time interval and I would say that the time interval would tend to negative the fact of a ligation of the femoral artery. * * * I think probably the way the gangrene did develop that it would be consistent with a partial occlusion of the femoral artery which retarded the circulation but did not completely cut it off."

The foregoing is, I believe, a fair digest as to the purport of the expert testimony. Both doctors negative the probability of a ligated femoral artery. While they do not rule out the possibility of an injury to the artery during the operation, there is not a single word of testimony tending to show that such an injury, if any there was, was due to a lack of skill, care or caution on the part of the surgeon performing the operation, and as this is the specification of negligence charged, there is a fatal lack of proof. As stated in O'Grady v. Cadwallader, supra, 183

Iowa at page 192, 166 N.W., page 759, "* * * in the absence of any showing from those learned in the profession that there was a failure to do that which ought to have been done in the treatment of the injury, or that there was that done which ought not to have been done in the treatment of the injury, there can be no recovery."

The decision in the majority opinion appears to be based primarily upon the failure of the trial court to submit the issue of abandonment to the jury. Under the record, a jury could well find that on or about June 24 the appellees abandoned the appellant and that he was without medical care, so far as any physician is concerned. The record does not show what, if any, care he received from the nurses and attendants at the Davenport hospital. This abandonment continued until June 27, when appellant was taken to Iowa City and placed under the care of the physicians there, at which time any abandonment that had existed, terminated. The petition specifies "that said abandonment and gross misconduct of said defendants * * * was the direct and proximate cause of the necessity for said amputations." Thus there is no question involved as to the lack of skill in the original operation. To support a verdict on this assignment of error, it was necessary for the jury to find, upon proper evidence, that the amputations would not have occurred but for the abandonment and it was incumbent upon the appellant to produce evidence to support such a finding. Ramberg v. Morgan, supra.

On June 23 or 24, when appellees last saw appellant, the leg was showing evidence of gangrene to such an extent that appellant was told that an amputation was necessary. He entered the Iowa City hospital on June 27 and it was not until July 7 that the first amputation was made.

Dr. Dorner stated:

"When he first came to the hospital I did not know how long he had had gangrene, he could have had it ten or fifteen days. He could have had the gangrene from the 14th up to the 27th of June when I saw him. Gangrene of an extremity doesn't come on just with a bang, to the degree where the lines of demarcation come in. * * * *The line of demarcation hadn't formed sufficiently for amputation when he came in.*"

Dr. Fowler stated:

"Sometimes the amount that you can conserve isn't in evidence for perhaps a week or two, and as soon as you are quite clear in your mind as to how much you can save, then you can go ahead with the amputation right away, or if you think that you can possibly save a little more, you can delay it on that basis until you are sure. * * * *I should say in two or three weeks it would become pretty obvious as to what the level of the amputation would be.*"

Appellant states that on June 22 Dr. Bessmer stated that the "foot as far as the knee joint" must come off right away. The majority opinion places great importance on this statement and especially the words "right away" as indicating that the delay from June 22, when the statement was made, until June 27, when he entered the Iowa City hospital, was the proximate cause of the necessity for the second amputation on July 21. This conclusion is not warranted by the record. It stands undisputed and on the statements of appellant's expert witnesses that neither on June 22, when the statement was made, nor on June 24, when the abandonment occurred, nor on June 27, when the abandonment terminated, had the gangrene reached the point of demarcation such as to warrant an amputation. In fact, this line of demarcation did not come until ten days after he entered the Iowa City hospital. While appellant is entitled to the most favorable view of the testimony, the mere statement that "the foot must come off right away" cannot overcome the statements of the expert witnesses on a technical proposition, such as we have here. As stated in Ramberg v. Morgan, supra, at page 481 of 209 Iowa, page 496 of 218 N.W.:

"Plaintiff, in a case of this character, may not stop upon a showing that the treatment or absence thereof presents a jury question on the pleaded negligence, and then have the jury turned loose, to set up their own standards, as nonexperts, as to the proximate cause of death. The only recognized standard. in such cases is essentially within the domain of expert testimony."

In my judgment, the decision of the trial court was correct and I would affirm the judgment.

WENNERSTRUM and MANTZ, JJ., join in this dissent.