# IN THE SUPREME COURT OF IOWA

No. 137 / 06-0243

Filed February 15, 2008

**BETTY D. SCHROEDER,** as Executor
of the Estate of HOMER SCHROEDER,
and **BETTY D. SCHROEDER,** Individually,

    Appellants,

vs.

**SAADI ALBAGHDADI, M.D.,**

    Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Gary D. McKenrick, Judge.

A physician seeks further review of a court of appeals decision granting the plaintiff a new trial. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

William J. Bribriesco and Daniel D. Bernstein of William J. Bribriesco & Associates, Bettendorf, for appellants.

Jack L. Brooks of Brooks & Trinrud, P.C., Rock Island, Illinois, for appellee.

**WIGGINS, Justice.**

A decedent's wife, individually and as executor of her husband's estate, received an adverse verdict in a medical negligence action. The wife appealed the verdict claiming the district court failed to submit all the specifications of negligence she requested and erroneously instructed the jury in a way that impermissibly commented on the evidence so as to interfere with the jury's fact-finding duties. The court of appeals agreed with the wife, reversed the judgment of the district court, and granted a new trial. On further review, we find the district court properly instructed the jury on the specifications of negligence supported by the evidence. We also find the district court properly designed the instructions to reflect the standard of care the physician owed his patient without interfering with the jury's fact-finding duties. Therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

In July 2001 Homer Schroeder underwent open-heart surgery for a blockage of three coronary arteries. Two weeks after his surgery, an ambulance took Homer to Mercy Medical Center in Clinton. His chief complaint was increasing shortness of breath. Homer also complained of nausea and anxiety. The emergency room physician, Dr. Randall Hinrichs, treated Homer. Hinrichs conducted a physical examination and ordered tests to measure the troponin and CPKMB enzyme levels in Homer's blood. Elevated levels of these enzymes would indicate an injury to Homer's heart. Hinrichs also ordered a full blood panel, a chest x-ray, an electrocardiogram (EKG), and an INR test, which measures the ability of blood to clot properly.

The blood tests revealed Homer's potassium, INR, and troponin levels were outside their normal ranges. The radiologist interpreted the chest x-ray to be abnormal with fluid in the lungs and cardiomegaly, an enlargement of the heart. A computer interpretation of the EKG also noted some abnormality. Hinrichs ordered a second EKG, which also indicated abnormalities. Hinrichs then compared this EKG to one taken prior to Homer's open-heart surgery and noted additional changes.

Hinrichs expressed to Homer's family, including his wife Betty, that he felt Homer should be admitted to the hospital. However, as an emergency room physician, Hinrichs did not have admitting privileges.

Hinrichs telephoned Dr. Saadi Albaghdadi, the on-call cardiologist. Albaghdadi was part of a cardiac group that included Homer's regular treating cardiologist, Dr. Qaiser Rasheed. Albaghdadi had the authority to admit patients.

There is a factual dispute between Hinrichs and Albaghdadi regarding how many telephone conversations took place and the substance of the conversations. Hinrichs testified he called Albaghdadi at home and told him about Homer's abnormal potassium, INR, and troponin levels. He also testified he told Albaghdadi about Homer's symptoms and asked that he admit Homer to the hospital. According to Hinrichs, Albaghdadi requested Homer's EKGs be faxed to his home before he would decide whether to admit Homer. He faxed a prebypass EKG and the July 17 EKG to Albaghdadi. According to Hinrichs, after he faxed the EKGs, he spoke with Albaghdadi a second time.

Hinrichs testified Albaghdadi convinced him Homer's troponin and EKG results were due to his recent bypass surgery and that Homer should be released and seen by Rasheed in the next day or two. According to Hinrichs, Albaghdadi had him stop Homer's Coumadin in

order to reduce his elevated INR and prescribed oral vitamin K. Hinrichs recorded his interpretation of this conversation in Homer's medical records.

Albaghdadi testified he never requested Homer's EKGs, rather they were sitting in his fax machine when he arrived home on the evening of July 17. Albaghdadi testified Hinrichs only requested an interpretation of Homer's EKGs. Albaghdadi testified this request was an every day practice, and Hinrichs had requested him to interpret EKGs without examining patients in the past.

Albaghdadi testified Hinrichs' phone call followed the faxed EKGs, and during their only conversation, Hinrichs explained the abnormal EKGs and Homer's history, including his recent bypass surgery. He further testified Hinrichs never told him about the abnormal potassium, troponin, or INR levels. Albaghdadi also testified Hinrichs never requested Homer be seen or admitted.

Albaghdadi testified he only interpreted the EKGs and told Hinrichs they showed postoperative changes and a pacemaker rhythm. Albaghdadi testified he did not think Homer needed to be hospitalized based on the information relayed by Hinrichs; however, had Hinrichs reported the elevated INR and potassium he would have admitted Homer immediately.

Hinrichs discharged Homer from the emergency room, but Homer returned to the hospital by ambulance the next morning. While Rasheed examined Homer, he went into cardiorespiratory arrest. He died later that afternoon.

Betty, individually and as the executor of Homer's estate, brought an action against Hinrichs and Albaghdadi for medical negligence. She

settled her claims against Hinrichs prior to trial. The trial commenced with Albaghdadi as the only defendant.

Betty presented two expert witnesses at the trial to establish the standard of care Albaghdadi should have used when treating Homer. Both of Betty's experts opined if Hinrichs' version of the July 17 events were correct, Albaghdadi breached the standard of care by failing to (1) properly interpret the EKGs; (2) examine Homer in the emergency room; (3) properly diagnose Homer in the emergency room; (4) direct that Homer be admitted to the hospital as an inpatient; and (5) properly treat Homer.

One of Betty's experts was asked what standard of care Albaghdadi should have used when caring for Homer if Albaghdadi's version of the July 17 events was true. Under that assumption, the expert opined Albaghdadi was only required to properly interpret the EKGs. Neither of Betty's experts testified Albaghdadi fell below the standard of care if Albaghdadi's version was true.

Albaghdadi's expert testified, assuming Albaghdadi's version was true, the only duty Albaghdadi owed to Homer was to properly interpret the EKGs. He went on to testify Albaghdadi properly interpreted the EKGs, and therefore met the applicable standard of care. The expert did state if Hinrichs told Albaghdadi about Homer's elevated potassium level, he should have admitted Homer to the hospital.

Throughout the trial, the court struggled with the issue of how to instruct the jury because of the factual dispute regarding the July 17 events. At the pretrial conference Betty's counsel requested the court to find a patient-physician relationship existed and Albaghdadi owed Homer a duty of care as a matter of law. The court reserved its ruling on this request until the close of the evidence. At the conclusion of the evidence,

Betty changed her position and argued the question of whether a patient-physician relationship existed, and whether Albaghdadi owed Homer a duty of care, should be a fact question for the jury.

During the arguments regarding a directed verdict, Albaghdadi conceded that he had a patient-physician relationship with Homer. Albaghdadi argued the only question for the jury to decide was the extent of the duty he owed Homer in light of the expert testimony and the conflict of his testimony with that of Hinrichs.

To resolve the issue the court decided to use two verdict forms. The jury was to use verdict form one if it found that Hinrichs only requested Albaghdadi to interpret Homer's EKGs, and Hinrichs did not tell Albaghdadi of the elevated potassium level. Verdict form one only allowed the jury to find Albaghdadi negligent for failing to properly interpret the EKGs.

The jury was to use verdict form two if it found Hinrichs sought admission of Homer to the hospital and told Albaghdadi of the elevated potassium level. Verdict form two allowed the jury to find Albaghdadi negligent for failing to (1) properly interpret the EKGs; (2) examine Homer in the emergency room; (3) properly diagnose Homer in the emergency room; (4) direct that Homer be admitted to the hospital as an inpatient; or (5) properly treat Homer.

Betty's counsel objected to the instructions claiming the court should not use two verdict forms because the record established as a matter of law a patient-physician relationship existed and Albaghdadi owed Homer a duty of care. He further argued only one verdict form should be used that listed all the acts of negligence alleged by Betty's experts, and then the lawyers could argue the extent of Albaghdadi's duty based on the evidence. He also requested the court to consider

using an interrogatory in the verdict form asking the jury: "Has a physician-patient relationship been established, yes or no. If yes, go to the issues of fault."

The court overruled this objection. Then Albaghdadi moved in limine to prevent Betty's counsel from arguing in closing arguments that Albaghdadi's on-call status created a duty greater than that established by the expert testimony. Betty's counsel stated he believed Albaghdadi owed a "full-fledge duty" to Homer because of Albaghdadi's on-call status, but in light of the court's ruling on the instructions, Albaghdadi's motion was probably correct. The court granted Albaghdadi's motion in limine.

The jury returned a verdict by using verdict form one. The first question on verdict form one asked: "Was the defendant negligent by failing to properly interpret the electrocardiograms of Homer Schroeder on July 17, 2001?" The jury answered this question in the negative. By using verdict form one, the jury found Hinrichs only requested Albaghdadi to give an interpretation of Homer's EKGs and did not tell Albaghdadi of the elevated potassium level. In other words, the jury determined Albaghdadi's version of the facts was correct. By answering the first question in the negative, the jury determined Albaghdadi properly interpreted the EKGs. The district court entered a judgment in favor of Albaghdadi.

Betty appealed. We transferred the case to the court of appeals. The court of appeals reversed the judgment and remanded for a new trial. Albaghdadi asked for further review, which we granted.

**II. Issues.**

Betty contends the court improperly instructed the jury for two reasons. First, she argues the court should have submitted all the

specifications of negligence instructed upon for the jury to consider, including an additional specification that Albaghdadi breached his duty of care by failing to ask Hinrichs questions regarding Homer. Second, she argues the court's instructions improperly interfered with the jury's fact-finding duties by impermissibly commenting on the evidence.

Betty's counsel preserved error on the issue of whether the court should have submitted all the specifications of negligence instructed upon for the jury to consider and that the instructions improperly interfered with the jury's fact-finding duties. However, her counsel did not object to the instructions for not including a specification that Albaghdadi was negligent for failing to ask Hinrichs questions. A party is required to request an additional instruction designed to remedy a perceived defect when the party claims an instruction does not completely state the law. *State v. Smith*, 240 N.W.2d 693, 695 (Iowa 1976). Failure to do so precludes us from determining the issue on appeal. *Poulsen v. Russell*, 300 N.W.2d 289, 294 (Iowa 1981). Therefore, we will not consider Betty's claim that the court failed to include a specification of negligence that Albaghdadi was negligent for failing to ask Hinrichs questions.

### III. Analysis.

The trial court has the obligation to instruct the jury on the law governing the issues it submits. *Harrington v. Fortman*, 233 Iowa 92, 100–01, 8 N.W.2d 713, 717 (1943); *Jakeway v. Allen*, 226 Iowa 13, 18, 282 N.W. 374, 377 (1938). For each act of negligence the court submits to the jury, it must tell the jury the legal duty owed by the defendant. *Id.* We look to legislative enactments, judicial decisions, and general legal principles to establish a legal duty or standard of care. *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 718 (Iowa 1999).

Albaghdadi holds himself out as a specialist in cardiology. Albaghdadi conceded that a patient-physician relationship existed between himself and Homer. We have established the standard of care a specialist must use when treating a patient. *McGulpin v. Bessmer*, 241 Iowa 1119, 1132, 43 N.W.2d 121, 128 (1950). In *McGulpin,* we expressed the standard of care as follows:

> A physician or surgeon who is held out as a specialist is required to exercise that degree of skill and care ordinarily used by similar specialists in like circumstances, having regard to the existing state of knowledge in medicine and surgery, not merely the average skill and care of a general practitioner.

*Id.* The failure of a physician to follow this standard of care constitutes negligence. *Id.*

In a medical negligence case such as this, expert testimony is required to establish the standard of care and a breach thereof. *Sinkey v. Surgical Assocs.,* 186 N.W.2d 658, 660 (Iowa 1971). At the close of the evidence, the court must instruct the jury on the defendant's duty when the evidence establishes that duty by a particular set of facts the jury may reasonably find to exist. *State v. Gough,* 187 Iowa 363, 366, 174 N.W. 279, 280 (1919).

The expert testimony only generated an issue for the jury to decide whether Albaghdadi was negligent for failing to (1) properly interpret the EKGs; (2) examine Homer in the emergency room; (3) properly diagnose Homer in the emergency room; (4) direct that Homer be admitted to the hospital as an inpatient; or (5) properly treat Homer, if the jury found Hinrichs' version of the conversations with Albaghdadi took place. On the other hand, if the jury found Albaghdadi's version took place, the only issue generated by the expert testimony for the jury to decide was

whether Albaghdadi was negligent for failing to properly interpret the EKGs.

At trial and on appeal, Betty's counsel contends he had a right to argue Albaghdadi was negligent for failing to (1) properly interpret the EKGs; (2) examine Homer in the emergency room; (3) properly diagnose Homer in the emergency room; (4) direct that Homer be admitted to the hospital as an inpatient; or (5) properly treat Homer, solely on the basis that Albaghdadi was the on-call cardiologist the evening of July 17. We disagree. Betty presented no expert testimony stating Albaghdadi was negligent in those respects solely because he was the on-call cardiologist. Consequently, the expert testimony did not establish such a duty existed. Therefore, Betty could not argue the case in that manner.

To prevent Betty's counsel from arguing the case in a manner not supported by the expert testimony, the court chose to use two verdict forms. The jury was to use the first verdict form if it found Hinrichs' version of the events took place and the second verdict form if it found Albaghdadi's version occurred.

Betty contends by using two verdict forms, the court impermissibly commented on the evidence. Instructions by the court that comment "on potential factual scenarios in which a standard of care may or may not have been adhered to" are impermissible comments on the evidence. *Peters v. Vander Kooi*, 494 N.W.2d 708, 712 (Iowa 1993). However, instructions designed to determine a physician's duty of care do not constitute an impermissible comment on the evidence. *Id.*

The fighting factual issue in this case was the substance of the communication between Albaghdadi and Hinrichs. Betty tried this case on the theory that the jury would believe Hinrichs' version of the events. According to her expert's testimony, the jury could have found

Albaghdadi negligent for the five specifications to which they testified if Hinrichs' version of the conversation took place.

Albaghdadi tried this case on the theory that the jury would believe his version of the events. His experts insisted Albaghdadi's only duty was to read the EKGs; thus, the jury could only find him negligent if he read the EKGs in a manner that fell below the standard of care.

Betty and Albaghdadi based their theories of negligence on two different sets of facts that were mutually exclusive. The parties tried the case by giving the jury only two alternative ways to decide it. The record did not allow the jury to incorporate parts of each side's expert testimony in deciding this case. The court did not give the verdict forms to the jury as potential factual scenarios in which a standard of care may or may not have been adhered to by Albaghdadi. The verdict forms provided the jury with a road map to determine the standard of care Albaghdadi owed Homer consistent with the jury's fact-finding. The verdict forms were also consistent with the manner in which the parties tried the case.

Therefore, we find the court properly designed the two verdict forms to allow the jury to determine the applicable standard of care once it decided the disputed facts. Although there may have been a better way for the court to instruct the jury, such as using special interrogatories rather than verdict forms, the court did not impermissibly comment on the evidence by using these forms.

**IV. Disposition.**

Because the district court properly instructed the jury on the specifications of negligence supported by the evidence and designed the instructions to determine the standard of care Albaghdadi owed Homer,

we vacate the decision of the court of appeals and affirm the judgment of the district court.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**