LEROY STOHLMAN, APPELLEE, V. B. B. DAVIS, APPELLANT.

FILED JUNE 13, 1928. No. 25258.

*Hainer, Flansburg & Lee,* and *Gurley, Fitch & West,* for appellant.

*Wilmer B. Comstock* and *Frampton & Polk, contra.*

Heard before ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

EBERLY, J.

This is an action by Leroy Stohlman against Doctor B. B. Davis and another for malpractice. The jury found for

plaintiff and against the defendant, B. B. Davis. The last named defendant appeals.

A brief summary of the facts developed at the trial is: The plaintiff, a youth of 18, was a sufferer of osteomyelitis. The seat of the trouble was in the right femur, a short distance above the knee. The onset of the disease first developed on November 10, 1923. He was taken from his farm home near Louisville, Nebraska, by his father, to the Clarkson hospital at Omaha, Nebraska, and there operated upon by Doctor B. B. Davis who had been employed to take charge of the case. The first operation occurred on November 12, 1923. On February 4, 1924, Doctor B. B. Davis performed a second operation at which time he removed a piece of the infected femur about four inches in length and one inch in width, stating that he had taken out all the bone he dared without incurring the danger of a fracture or a separation of the femur. No cast, splint or support was placed upon the leg after this operation until March 8, 1924, when a splint was applied, and on March 25, following, the leg was put in a cast.

During plaintiff's confinement in the hospital the weakened femur separated. The exact date of this occurrence is not fixed beyond dispute in the evidence. From plaintiff's testimony it may be inferred that it took place soon after the operation of February 4 while the limb was still without support of splint or cast, and that it remained in this condition without attention until March 8.

Doctor Lord, who appears in the case as a witness for the defendant and who was present and assisted in the operation on plaintiff's foot on March 8, testified, in substance, that he was called into the case by plaintiff's father; that in company with Doctor Herbert Davis he made an examination of plaintiff's foot on March 7; that, notwithstanding the existence of natural drainage, "some pus was retained;" that "the parts fluctuated;" that the conclusion arrived at in consultation between the two doctors that "drainage should be had immediately" was evidenced by the fact that "arrangements were made to attend to it the

next morning, March 8;" that at this operation on plaintiff's foot on March 8, it was developed that osteomyelitis, apparently originally seated in the metatarsal bone, had extended to other bones in the foot; that, in his opinion, there was osteomyelitis in the metatarsal bone for a considerable period prior to the time of the operation; that the exact extent of time during which this condition obtained would be impossible to state; neither would the doctor state that, had the operation of March 8 been performed a week earlier, the plaintiff might not have had an absolutely normal ankle.

It appears from the evidence that Doctor Lord did not discover the separation of the femur at the time of the operation on the foot on March 8. Later, it appears that he informed Stohlman's father that the femur had separated, and the record sustains the conclusion that at this time the witness was of the opinion that the separation "might have occurred prior to the time he got on the case."

On or about February 20, 1924, Doctor B. B. Davis became ill. For the purpose of a thorough examination and treatment he went to Rochester, Minnesota, to consult Mayo brothers, eminent specialists of that place. He did not return to Omaha until February 26 following. At the time of his return from Rochester he remained in Omaha but a few hours when he continued on to Arizona where he remained for a little over a month recuperating under the advice of the physicians consulted. During the few hours in Omaha on February 26, he called on Stohlman at the hospital. There had been an X-ray plate made which was examined by him, and a consultation was also had with Doctor Herbert Davis in whose charge Stohlman had been placed by Doctor B. B. Davis. The conclusion of the consultation was that osteomyelitis was developed in the right foot; that there was infection in some of the bones thereof, but that, as drainage was apparently good and the temperature then normal, it was thought that no immediate operation was necessary.

Doctor B. B. Davis, at the time of leaving for Rochester,

Minnesota, as well as when leaving for Arizona, wholly failed to notify either the plaintiff or the plaintiff's father of his intended absence. Stohlman was taken over wholly without his own consent or the consent of his father by Doctor Herbert Davis, and without knowledge or notice that Doctor B. B. Davis, by reason of his enforced absence, had practically abandoned the case. In fact, Stohlman and his father were not advised of the situation or of the absence of Doctor B. B. Davis until about March 7, 1924, at which time Doctor Lord took over the case and whose treatment thereof is not in any manner criticized in the evidence. The plaintiff was not discharged from the hospital until May 15, 1924. At that time his right leg had been permanently shortened about an inch, and the right ankle and foot were and still are in a condition of permanent immovability.

The first appearance of the trouble in the right foot was on November 14, 1923. At that time at a point just above and a little to the right of the big toe, it became swollen, inflamed, and discolored. It was treated by local applications with a varying degree of success until March 8, 1924, when a surgical operation, performed by physicians other than defendant, was had which fully disclosed that the true nature of the trouble was osteomyelitis. Thereafter it appears that Stohlman's progress to recovery was regular and continuous.

The trial judge narrowly defined the issues upon which the case was submitted. Only the following questions, in specific and definite form, were submitted to the jury for determination: Whether the defendant was negligent in omitting to apply to the leg a cast, splint or other support to prevent a separation of the femur which the disease disintegrated and weakened, and after a portion thereof had been removed by operation. Whether the defendant was negligent in failing to diagnose the disease of the foot as osteomyelitis, and to provide proper drainage therefor on or prior to March 8, 1924. Whether the defendant was negligent in abandoning plaintiff at a critical period of

plaintiff's illness without proper notification of his necessary absence.

The high standing of the defendant as a surgeon is not questioned in this action. The possession by him of the degree of knowledge and skill requisite to practice his chosen, profession is an admitted fact of the record before us.; in fact, the record discloses without any contradiction whatever that the defendant is exceptionally well qualified and has long enjoyed an extensive practice in the field of his chosen profession—that of general surgery.

The question before us presents and involves no question, therefore, of qualifications of the defendant. The inquiry is strictly limited as to whether Doctor B. B. Davis, in treating Stohlman, exercised the ordinary care, skill and diligence which, in view of his undoubted qualifications, the law would require to be exercised on behalf of his patient.

It may also be said as a general rule, in determining what constitutes reasonable and ordinary care, skill and diligence, the test is that which physicians and surgeons in the same neighborhood and in similar communities, engaged in the same or similar lines of work, ordinarily exercise and devote to the benefit of their patients.

There is no fixed standard in law by which a court is enabled to arbitrarily say in every case involving a charge of malpractice what conduct shall be considered as an exercise of reasonable and ordinary care, skill and diligence, and what shall constitute ordinary care, diligence and skill under any and all circumstances. The terms, ordinary care, ordinary skill, ordinary diligence, and like expressions, as applied to the conduct of physicians and surgeons with reference to their patients, have a relative significance, and cannot be arbitrarily defined.

Triers of fact in cases wherein these questions are involved are necessarily dependent to a degree, at least, on witnesses versed in the sciences of medicine and surgery. When a given state of facts, submitted to the jury, is such that reasonable men may fairly differ on the question as to whether there was negligence or not, the determination

of the matter is for the jury, as triers of fact. It is only where the facts are such that all reasonable men must draw the reasonable conclusion from them that the question of negligence or, in substance, of ordinary care, ordinary skill, and ordinary diligence, is ever considered as one of law for the court. *Grand Trunk R. Co. v. Ives,* 144 U. S. 408.

Considering the questions as submitted by the district court to the jury and in view of them, it may be said that the relations between physician and patient are personal and highly confidential, and on engaging a physician to treat his case a patient impliedly engages him to attend throughout that ailment, or until his services are dispensed with. The patient places himself in the hands of the physician and surgeon and thereafter relies upon the judgment or knowledge of the physician or surgeon in question. When a surgeon performs an operation, not only must he use reasonable care and skill in its performance, but also, in subsequent treatment of the case, it is his duty to give the patient such attention after operation as the necessities of the case demand, in the absence of any special agreement limiting the service or reasonable notice to the patient.

It is also to be remembered in this connection that the facts in the record disclose that the defendant, by his excellent preparation and for thirty odd years of successful practice, had acquired peculiar qualifications and special knowledge on the subject of surgery. In short, his employment by the plaintiff was, in fact, if not in name, the employment of a specialist or an expert in surgery. It would seem, in view of the nature of his employment and the circumstances and conditions of his patient, as shown by the record in this case, that to substitute for himself another physician of but three or four years' experience in the practice without any notice to, or agreement with, the patient involved or those representing him, would be not only a clear violation of duty but, in effect, to utterly abandon the case.

We do not overlook the fact that the doctor was ill; that

his physical condition prevented the rendition of further services. But his physical condition did not interfere with or prohibit the giving of due and ample notice of his disability to his patient or to his patient's father. The clear duty, under the circumstances, was imposed upon him either to secure the patient's acceptance of the substitution of his son, Doctor Herbert Davis, or to give him notice so as to secure another physician or surgeon of his own choice.

In view of the situation that existed at that time, and the manifest failure of the defendant to discharge his full duty imposed by the circumstances, we certainly approve the instructions given by the trial court which were substantially in accord with the conclusion stated.

The record contains ample evidence which, if believed, sustains the conclusion that, at the time the defendant herein left Nebraska for Arizona, the plaintiff was in a critical condition.

The undoubted rule applicable to the situation is that "a physician who leaves a patient in a critical stage of the disease, without reason, or sufficient notice to enable the party to procure another medical attendant, is guilty of a culpable dereliction of duty, and is liable therefor." 30 Cyc. 1576. See, also, *Burnett v. Layman*, 133 Tenn. 323.

On the question of whether the defendant was negligent in omitting to apply to the injured leg a cast or splint or some other support to prevent a separation of the weakened femur after the operation upon it, and as to whether the means taken by the defendant in treating and providing drainage for the infected foot, under the circumstances disclosed by the evidence, were in accord with the mode established and followed by his school of practice for the treatment of such cases, that is, in accord with good practice, and as to the nature of the results occasioned thereby, the evidence is certainly conflicting. The conflict is decidedly emphasized in the expert testimony introduced by the respective parties. But, as to the latter feature, this court is committed to the doctrine:

"In a malpractice case it is not necessary to sustain a verdict for the plaintiff, that all the expert witnesses called should consider the treatment pursued by defendant improper; nor will the fact that all such witnesses agree that a portion of such treatment is proper, under some circumstances, in itself defeat a recovery." *Hewitt v. Eisenbart*, 36 Neb. 794.

There can be no question but what, under the evidence in the record before us for examination in this case, reasonable men may draw different conclusions on the controlling issues involved herein. But, it fairly appears that this record contains evidence positive and significant in character which, uncontradicted, would support a verdict for the plaintiff. This being true, the fact that it was decisively and fully contradicted by the witnesses for the defendant does not militate against the force and effect and conclusiveness of the decision of the triers of fact in this case on the points then in dispute.

It is to be remembered that the jury to whom these matters were submitted under proper instruction by the district court, under our system, are the sole judges of the credibility of the witnesses and the weight given to their testimony. In this manner and on this basis only may the constitutional right of trial by jury be accorded litigants.

We are indeed committed to the doctrine that it is elementary that, in a jury trial, when different minds may reasonably reach different conclusions from a given statement of facts as to whether negligence has been established, the question of negligence is for the jury. *Casey v. Ford Motor Co.*, 108 Neb. 352.

The same principle applies to the evidence upon which the amount of damages was determined. While it is conflicting, and while triers of fact might have been justified, if certain evidence was to be believed, to have found against the plaintiff, yet their verdict discloses that other witnesses were accepted and other testimony believed which conflicted with the first evidence referred to.

In brief, it may be said that the questions presented in this case, and which are controlling in its determination, are wholly dependent upon the credibility of witnesses and the weight of testimony. It is thus to be determined as a question of fact. It was so determined by the jury against the contentions of the defendant. We do not find that the verdict is unsupported by the evidence.

It therefore follows that the judgment of the district court must be deemed right, and the same is

AFFIRMED.

GOSS, C. J., took no part in the decision.