EDNA ACKER, APPELLANT, v. C. N. SORENSEN, M.D., APPELLEE.

165 N. W. 2d 74

Filed February 7, 1969. No. 37053.

Marti, O'Gara, Dalton & Bruckner, for appellant.

Wright, Simmons & Hancock, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ., and COLWELL, District Judge.

McCOWN, J.

This is an action for malpractice. The defendant's motion for summary judgment was sustained by the trial court on the ground that plaintiff's cause of action was barred by the statute of limitations.

The pleadings, deposition, and affidavit of the plaintiff, Edna Acker, assert that she first had a skin disorder in 1956. There was a small lump on the side of her nose and one on her cheek. She consulted Dr. Blackstone of Bridgeport, Nebraska, who burned them off with acid. On August 30, 1957, after a recurrence of the small lump on her nose, the size of a kernel of rice, she consulted Dr. Gentry of Gering, Nebraska, who told her to go to Dr. Sorensen, the defendant here, and have the lump X-rayed off. She saw Dr. Sorensen the same day and he used X-ray to treat the condition. Dr. Sorensen advised her that the condition was not cancerous and did not take a biopsy at that time. She experienced difficulty for 3 or 4 months. Thereafter the scab was gone and it seemed to be healed.

In September of 1958, she had a drawing sensation inside her nose and saw Dr. Sorensen again. It was all healed on the outside and Dr. Sorensen told her to be

patient. The drawing sensation left and she had no more trouble until 1961. In 1961, there was a breaking out and bleeding at the place where her nose had been X-rayed. She went to Dr. Blackstone, who gave her some salve, and she consulted him several times in 1961. The condition on her nose would heal for 3 or 4 weeks and then break out again.

In May 1962, she went to Dr. Palmer in Bridgeport, Nebraska, about the disorder on the left side of her nose. Dr. Palmer was retired from the active practice of medicine at that time, but agreed to see Mrs. Acker in his home. After examining the condition on the left side of her nose, Dr. Palmer advised Mrs. Acker that, in his opinion, it was cancer and that it was caused from an X-ray burn. Dr. Palmer suggested that Mrs. Acker go to the Mayo Clinic. After reporting Dr. Palmer's opinion to her husband, her husband suggested that she again contact Dr. Sorensen about the matter because he had administered the X-ray treatment. Mrs. Acker called Dr. Sorensen and he agreed to see her the same day. At that time, after examining the left side of her nose, Dr. Sorensen advised Mrs. Acker that Dr. Palmer was right; that the X-ray burn had caused a cancer of some kind, but that he did not feel it was necessary for her to go to Mayo's; and that he could take care of the condition. Dr. Sorensen then undertook to cauterize the area with an electric needle. This was in May 1962. Mrs. Acker saw Dr. Sorensen again in June 1962, and he gave her a prescription for some salve and told her to stay out of the sun. At his suggestion, she returned in July 1962, and Dr. Sorensen cauterized an area where he had not burned it before. He said he did not have all the cancer. She saw him again in August 1962, and he again cauterized the area. After the cauterization in August 1962, it seemed to heal up. The redness went away and the bleeding stopped. At his suggestion, Mrs. Acker returned to see Dr. Sorensen in September 1962. He told her that everything looked fine and that the cancer was

all gone. He suggested that she return in approximately 3 months. Mrs. Acker returned to see Dr. Sorensen in December 1962. At that time the condition still appeared to be healed, but she was having some difficulty with her nose in the area of the bridge where the glasses came in contact with the nose. Dr. Sorensen again assured her that the cancer had been cured and that she had nothing further to worry about.

Mrs. Acker had no further trouble until approximately July or August of 1963. The area began bleeding again and would get red. In August 1963, she again consulted Dr. Sorensen who cauterized it again in three places. He assured her that it was not cancer and assured her that he could clear it up without much difficulty. At his suggestion, she returned to see him again in September and October of 1963, at which time he did not perform any further cauterization with the electric needle, but merely gave her a prescription for salve which he suggested that she apply daily. The condition seemed to improve. She returned to Dr. Sorensen in November at his suggestion, and he said that everything was fine and so far as she knew, everything was fine.

In 1964, while visiting in California, the area on the left side of her nose became red, bled, and developed a scab. She called and made an appointment with a skin specialist, Dr. Lewe. The appointment was about a week ahead and by the time she reached his office, the condition was all healed up. She reported to Dr. Lewe that her former doctor had told her she had had cancer but that it was cured. Dr. Lewe told her that there was no cancer showing at the time that he could see, and that he didn't think there was ever any cancer there because he didn't think any doctor would ever treat her condition with an electric needle and X-ray without taking a biopsy. Dr. Lewe did not administer any treatment.

In the summer of 1965, the area on the left side of her nose again began to break out occasionally and bleed,

and for the first time, Mrs. Acker began to have some pain in this area. She had had the pain for some 2 or 3 months before she went to see Dr. Gentry on approximately July 21, 1965. He examined her and, for the first time, said that they would take a biopsy, but asked her to go over and have Dr. Sorensen look at it. She went to see Dr. Sorensen the same day and he examined the nose, but gave her no treatment. He sent her back to Dr. Gentry, who agreed that she could wait for the biopsy until after a short trip she was planning. She returned to Dr. Gentry's office and the biopsy was taken on August 3, 1965. This was the first biopsy taken of the area on the left side of her nose. Mrs. Acker was not informed of the results of the biopsy until approximately August 16, 1965. At that time, Dr. Gentry advised her that she had cancer. She was referred to a Dr. Heinke who examined her on the same day, and thereafter she was referred to Dr. Latenser in Omaha, Nebraska. August 16, 1965, was the first time that Mrs. Acker was told that the condition on the left side of her nose was still cancerous and that it was a very serious cancerous condition.

Mrs. Acker went to Omaha approximately August 23, 1965, and at that time Dr. Latenser did another biopsy and then recommended a procedure called chemo-surgery. This procedure was performed on August 24, 1965, by Dr. Latenser. The surgery revealed that the subcutaneous cancer had spread massively through the left side of her face. Treatments by Dr. Latenser were carried out in Immanuel Hospital in Omaha through September 30, 1965. A biopsy taken at the Mayo Clinic in February 1966, revealed that the chemo-surgery had successfully eradicated the cancer.

This action was brought against Dr. Sorensen on August 1, 1967. The sole issue presented at the hearing on the motion for summary judgment was whether the statute of limitations had run. The statutory period in

Nebraska is 2 years. The trial court held the action was barred by the statute.

There is a great divergence of opinion among courts in determining the proper event which starts the period of limitation against a malpractice action. Conflicting policies are involved. On the one hand is the policy of protecting the practitioner from stale demands, with the consequent dangers of missing witnesses, and errors in memory and recollection of available witnesses. On the other hand is the policy of protecting patients against negligence of medical practitioners, which is often difficult to discover within the statutory period of limitation. Cases considering this question are collected and discussed in an annotation in 80 A. L. R. 2d 368, and in earlier annotations appearing in 144 A. L. R. 209, and 74 A. L. R. 1317.

Theoretically, there are several choices as to the event which will start the running of the statute of limitations. The plaintiff contends that the discovery rule adopted by this court in Spath v. Morrow, 174 Neb. 38, 115 N. W. 2d 581, applies to malpractice actions generally. The defendant contends that the end of treatment rule set out in Williams v. Elias, 140 Neb. 656, 1 N. W. 2d 121, is the proper rule, and that the application of the discovery rule in Spath v. Morrow, *supra*, should be limited to cases involving foreign objects. We think it clear that the rule of Spath v. Morrow, *supra*, was intended to apply broadly. That case held that a cause of action for malpractice based upon the alleged failure of a physician to remove a foreign object left in the body of a patient by mistake does not accrue until the patient discovers, or in the exercise of reasonable diligence should have discovered, the presence of the foreign object. That discovery rule was extended to conditions other than foreign objects in the case of Stacey v. Pantano, 177 Neb. 694, 131 N. W. 2d 163. We said there: "The treatment and advice were part of the duties that arose in law from the nature of his employ-

ment as a physician. The cause of action, therefore, accrued when the alleged breach of duty was discovered, * * *." Citing Spath v. Morrow, *supra*.

It should be noted here that the specific charges of negligence against the defendant include not only the original X-ray treatment in 1957, and the cauterization in 1962 and 1963, but include charges of faulty diagnosis and medical advice, and failure to diagnose and advise, which interfered with proper tests and treatment, as well as the failure at any time to take a biopsy. Obviously, the situation here involved the acceleration of an existing condition into an aggravated state. This was "the product of a period of time rather than a point of time" and in such circumstances, the plaintiff should be held to be "injured" only when the accumulated effects manifest themselves. See, United States v. Reid, 251 F. 2d 691 (5th Cir., Miss.); Urie v. Thompson, 337 U. S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282, 11 A. L. R. 2d 252.

There is obviously a distinction between notice of negligent act and notice of its consequences. This court is already committed to the discovery rule. As we said in Spath v. Morrow, *supra:* "Patients should not be encouraged to go from physician to physician in an effort to ascertain whether the diagnosis made and the treatment received are proper. Silence on the part of the physician for the statutory period should not destroy the rights of the patient." The principle becomes even more compelling where affirmative representations as to a cure replace silence. We, therefore, hold that in a malpractice action against a physician, the statute of limitations does not commence to run until the time the act of malpractice with resulting injury was, or by the use of reasonable diligence could have been, discovered. We do not pass on the effect of continued treatment by the physician after discovery.

This case involves a motion for summary judgment. There is a factual issue as to whether the plaintiff, by

the use of reasonable diligence, could have or should have discovered the continued existence of the cancer more than 2 years prior to the filing of the action here. At a hearing on a motion for summary judgment, the moving party has the burden of showing that no material issue of fact exists and unless this is done conclusively, the motion must be overruled. Youngs v. Wagner, 172 Neb. 735, 111 N. W. 2d 629.

The judgment is therefore reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED AND REMANDED.