ALICE TOMAN, APPELLANT, v. CREIGHTON MEMORIAL ST.
JOSEPHS HOSPITAL, INC., A CORPORATION, AND WILBUR A.
MUEHLIG, M. D., APPELLEES.
217 N. W. 2d 484
Filed May 2, 1974. No. 39234.

Daniel G. Dolan of Lathrop, Albrecht & Dolan, for appellant.

Kennedy, Holland, DeLacy & Svoboda, for appellee Creighton Memorial St. Josephs Hospital, Inc.

Theodore J. Stouffer and John B. Henley of Cassem, Tierney, Adams & Henatsch, for appellee Muehlig.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, NEWTON, and CLINTON, JJ., and COLWELL and WARREN, District Judges.

WARREN, District Judge.

This is a malpractice suit in which plaintiff Alice Toman filed her original petition on August 27, 1969. The defendant Wilbur A. Muehlig, M. D., pleaded the 2-year statute of limitations, section 25-208, R. S. Supp., 1972, and requested a separate trial on that issue as provided for in section 25-221, R. S. Supp., 1972. The trial court

found "that plaintiff discovered the alleged malpractice or negligent conduct in June of 1967, immediately following her surgery and that again on July 15, 1967, plaintiff was advised by defendant of his lack of knowledge concerning the cause of her disability," and dismissed plaintiff's cause of action against Dr. Muehlig on the grounds that it was barred by the statute of limitations.

The facts relevant to the statute of limitations issue are not in serious dispute. The evidence establishes that plaintiff had for some years suffered from spasmodic torticollis, a unilateral contraction of the neck muscles which forced her head to the left and caused severe pain. On June 19, 1967, the defendant performed an anterior cervical rhizotomy, which was a surgical sectioning of the nerve roots in the area of the spinal cord in order to innervate the neck muscles that were in spasm and to give relief from the pain and spasms.

On June 9, 1967, plaintiff had been examined by the defendant, the diagnosis of spasmodic torticollis was made, and surgery was recommended. Plaintiff returned with her husband on June 14, 1967, for a further discussion. Because of the close questions involved in determining when plaintiff's cause of action accrued and the statute of limitations commenced to run we reproduce the medical notes of defendant in their entirety for the period commencing June 14, 1967, until the last contact on February 19, 1968. They read as follows:

"June 14, 1967: Surgery for the patient's torticollis was discussed with her including the nature of the procedure consisting of laminectomy and section of the upper ventral cervical roots and the probable necessity for a second minor procedure on the right sternocleidomastoid muscle. She was told that she could expect considerable improvement but there might be some residual movement and that her pain should be considerably improved also. She was told that atrophy of the cervical muscles would occur. She wants to go ahead with the surgery.

June 19, 1967: Cervical laminectomy was done today, sectioning the first three ventral roots on the right and also the right first dorsal root (which was present). The same was done on the left plus the 4th ventral root. Patient's condition remained good throughout.

June 20, 1967: Since surgery patient has had weakness of both upper extremities which is slight on the right and marked on the left. It is improving. Otherwise condition good. No residual neck spasms.

June 24, 1967: Patient is to be followed by Dr. McKinney in my absence. Left triceps action is improved and grip is slowly improving but there seems to be little movement of the left biceps or at the left shoulder.

July 1, 1967: Patient's left arm is only slightly improved in the past week. She has been up and around and while she has been a little weak generally her gait is improving and she is feeling better generally. Sutures were removed yesterday. Some reaction around them but wound appears to be healing satisfactorily.

July 3, 1967: Patient was dismissed from the hospital today. Left arm improving slightly and slowly. Is able to walk alone now and can hold her head up without the brace. Wound is healing well. Asked to come to the office for recheck in ten days to two weeks.

Given prescription for Darvon Compound 65, 24 caps, sig one q four hours p.r.n. pain. Patient has been having some low back pain probably from staying in bed a good deal and she has had some trouble with this before. Also prescription for Nembutal gr. 1 ½, 12 such caps, sig one at bedtime if necessary for sleep.

July 18, 1967: Patient seems to be getting along satisfactorily. Left arm is considerably improved except for abduction at the shoulder and flexion at the elbow, both of which are very weak. Other movements are somewhat weak but better. Her torticollis seems to be well controlled. Holds her head up satisfactorily and gait is good although she complains of being a little unsteady.

Patient has various complaints such as trouble moving her bowels and a feeling of tightness in her abdominal muscles on the left. Also complains of some pains, especially in her neck muscles.

Patient was reassured and it was recommended that she continue to exercise and let her husband continue to use physiotherapy on her left arm. Is to return for recheck in two weeks.

August 14, 1967: Patient continues to have little movement actively of the left shoulder and very little left biceps function. Extension of the elbow and left hand function is fairly good. Complains that she has a good deal of pain in her neck and arms. Her head has a tendency to go forward when she is up walking although does fairly well with it.

A few days ago the patient was swinging a weight with her left arm vigorously and suddenly had pain medial to her right scapula and in the upper thoracic region associated with a good deal of swelling. The swelling has gone down and the pain has improved but it is still bothering her some. At this time for a short time she had difficulty in using her right arm as well as increased difficulty with her left arm. These have apparently gone back to about the way they were. States that her gait is a little unsteady.

There is still a little swelling over the lower part of the operative area but there does not appear to be any bony displacement. X-rays of the cervical spine considered but it was decided to postpone these in view of her improvement. Is to continue on physiotherapy and it was suggested that she use her neck brace as little as possible. She occasionally takes a Darvon Compound capsule but not very often.

Asked to return in about six weeks.

September 1, 1967: Patient has been having an itching sensation and some discomfort in the right sternocleidomastoid region and occasionally some difficulty in swal-

lowing. She was reassurred. Her neck pain has apparrently been much improved and her general appearance is better. She still has practically no strength in her left biceps but her left grip seems a little better and also triceps function. It was recommended that she try to increase her activities. She is no longer wearing her neck brace and seems to get along satisfactorily. No spasms of the neck muscles.

February 19, 1968: Patient has many complaints of pains all over, especially in her neck and in her left arm. Her husband has to massage her frequently in the evening. Patient is rather depressed.

Muscle function in the left biceps is definitely returning and she is able to flex her left arm to a limited degree against the weight of her forearm and she is also able to abduct her left shoulder with moderate strength. Abduction of the left shoulder is of good strength, triceps has good strength and the grip is good. She does not have definite turning of her head although at times there is apparently spasm of the right sternocleidomastoid muscle.

Patient was reassured and given a prescription for Librium, 10 mgs., 50 such caps, sig. one t.i.d. with meals. It was recommended that she continue to work with flexing of the left arm to increase its strength as well as movements of the left shoulder."

Plaintiff alleges that defendant was negligent in damaging the cervical spinal cord, leaving her with permanent severe weakness of the left arm and fingers.

Defendant contends that there was no continuing course of negligent treatment and that the statute of limitations started to run when plaintiff knew that the surgery caused an injury even though the plaintiff was without technical knowledge said conduct might constitute negligence and without knowledge of the full consequences of the injury.

Defendant relies on plaintiff's testimony that her left arm was "completely dead" and "not moveable" when

she awoke after surgery on June 19, 1967; that she realized while hospitalized this was not an expected result; and her statement that at her first office visit following her discharge from the hospital on July 18, 1967, Dr. Muehlig was surprised at the difficulty she was having with her arm and said he didn't know what caused it.

Plaintiff testified that Dr. Muehlig told her before the operation she would have a numbness of the head, and a weak neck, but it would eventually get strong and all right; that on waking from surgery she could not move either of her arms; that she thought it would come back and be all right; that her right arm regained its strength eventually and her left arm improved some, but that she cannot now raise it; that she is unable to hold her head up and needs assistance walking; that when she saw Dr. Muehlig on June 20, June 24, July 1, July 3, and July 18, 1967, he told her to continue to exercise and have her husband use physiotherapy on her left arm, and on July 18, 1967, Dr. Muehlig told her to return in 2 weeks; that on August 14, 1967, defendant told her to continue on physiotherapy and return in 6 weeks; that on office visits on September 1, 1967, and February 19, 1968, Dr. Muehlig told her to continue to work with flexing of her left arm to increase strength as well as movements of the left shoulder; that she did not return to Dr. Muehlig, but attempted physical therapy for some time, to no avail; that at no time between July 1967, and February 1968, did Dr. Muehlig tell her there was anything permanently wrong, but instead reassured her and advised her to continue physiotherapy; that she subsequently consulted two different medical doctors, and a physical therapist who worked with her for several months, but her condition remained the same; and that finally on March 16, 1972, she was examined by a Dr. Lawrence Kaplan, in New York City, who advised her that her present condition was permanent.

Dr. Muehlig's testimony regarding the September 1, 1967, office call is especially illuminating:

. "Q. When did you next see her? A. September 1st, '67. Q. What occurred on that visit? A. * * * Her neck pain at that time was much better, she looked better generally, the left biceps was still very, very weak. The left grip was a little better yet. The extension of the elbow was present. She wasn't wearing her neck brace at that time. She hadn't had any spasms of her neck muscles; that is, in any of the abnormal movements. So basically she was doing quite well, except her arm had changed a little. Q. Well, did you feel that you had obtained a suitable result? A. Except for the arm I thought so. Q. How did you account for that? A. I couldn't understand it. I just had no explanation and I told them that."

Defendant in effect asks the court to require a patient with an unexpectedly weak left arm following surgery to "understand it" and arrive at an "explanation," prior to the time the defendant surgeon himself could understand or explain the unexpected result. Such is not the purpose of the statute of limitations nor of the underlying policy of protecting practitioners from stale demands.

This court has said: "* * * 'Silence on the part of the physician for the statutory period should not destroy the rights of the patient.' The principle becomes even more compelling where affirmative representations as to a cure replace silence." Acker v. Sorensen, 183 Neb. 866, 165 N. W. 2d 74 (1969). Here, we have more than mere silence. On September 1, 1967, defendant's notes state: "She was reassured." At her last visit on February 19, 1968, "Patient was reassured." While the record is devoid of any explanation of what assurances were given, we can readily infer from the whole record that the patient was assured and reassured by defendant that the post-operative weakness of the left arm would disappear with the passage of time and the recommended therapy. Plaintiff was entitled to rely on these assurances and to

reasonably believe during that period that she would not suffer any permanent loss of the use of her left arm.

"Malpractice" has been defined by the court as the treatment of a case by a surgeon or physician in a manner contrary to accepted rules and with injurious results to the patient; hence, any professional misconduct or any unreasonable lack of skill or fidelity in the performance of professional or fiduciary duties. Post-operative treatment and advice by the physician to the patient are an interwoven and essential part of the physician-patient relationship. Stacey v. Pantano, 177 Neb. 694, 131 N. W. 2d 163 (1964).

This court has long adhered to the discovery rule first adopted in Spath v. Morrow, 174 Neb. 38, 115 N. W. 2d 581 (1962), which is not restricted to presence of foreign objects, Stacey v. Pantano, *supra*, and which is intended to apply broadly. Acker v. Sorensen, *supra*.

That discovery rule is: In a malpractice action against a physician, the statute of limitations does not commence to run until the time the act of malpractice with resulting injury was, or by the use of reasonable diligence could have been discovered. Acker v. Sorensen, *supra*.

We continue to adhere to that rule.

However, in applying the discovery rule to these facts, we must construe the phrase "with resulting injury" in the light of a 7½-month course of post-operative care, advice, and reassurance as evidenced by the defendant's own personal office notes. There is no evidence of actual discovery of permanence of injury by plaintiff during that period of time. The question is whether plaintiff could have, with the use of reasonable diligence, discovered the alleged act of malpractice and the resulting injury. The presence of an unexpected result after surgery should not be tantamount to discovery of the negligent act and the resultant injury, where the surgeon himself repeatedly reassures the patient that she is improving and recovering from the unexpected result, prescribes a course

of therapy outside the office to aid in recovery, keeps the patient returning, and fails during that post-operative period to either determine or advise the patient that the unexpected result (weakness of the left arm) is a permanent condition from which she will not recover.

Under the circumstances, we cannot hold that the statute of limitations began to run until the plaintiff could have discovered by the use of reasonable diligence that her resulting injury was permanent, as contrasted with a temporary post-operative injury.

A patient who has an unexpected result from surgery has used reasonable diligence within the meaning of the discovery rule where she does not discover an act of alleged malpractice and resulting injury during the post-operative period because of the surgeon's repeated assurances of recovery combined with repeated recommendations for therapy to aid in that recovery.

We hold that the clear weight of the evidence is that the statute of limitations did not begin to run until sometime after the last of defendant's assurances and recommendations for post-operative strengthening exercises and therapy on February 19, 1968. It follows that the plaintiff's cause of action had not been barred by the 2-year statute of limitations on August 27, 1969, and the action of the trial court was erroneous in dismissing plaintiff's petition as against the defendant Wilbur A. Muehlig, M. D.

The judgment is therefore reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED AND REMANDED.