REBECCA DAU MCLAUGHLIN, APPELLANT, V.
LESLIE C. HELLBUSCH, M.D., APPELLEE.
591 N.W. 2d 569

Filed April 2, 1999. No. S-97-1091.

James E. Harris and Britany S. Shotkoski, of Harris, Feldman Law Offices, for appellant.

William M. Lamson, Jr., and David J. Schmitt, of Lamson, Dugan & Murray, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In this medical malpractice action, a jury returned a verdict in favor of defendant-appellee, Leslie C. Hellbusch, M.D. Plaintiff-appellant, Rebecca Dau McLaughlin, appeals the district court's denial of her motion for directed verdict. McLaughlin asserts that after Hellbusch performed two surgeries on her, he failed to refer her to a physician who could treat progressive, or abnormal, kyphosis of the spine. Because there existed a factual dispute, the district court was correct in denying McLaughlin's motion for directed verdict. We affirm.

## BACKGROUND

### MEDICAL TREATMENT

McLaughlin, when 14 years old, was not recovering properly from the last of two surgeries performed following two separate knee injuries and was reporting numbness in her feet. One of her attending physicians, William M. Walsh, M.D., an orthopedic surgeon who specialized in sports medicine, referred McLaughlin to a neurologist, who in turn referred her to

Hellbusch, a specialist in neurosurgery. Hellbusch first saw McLaughlin on February 15, 1988, and in that initial visit he discovered a cyst on McLaughlin's spine. He immediately performed laminectomy surgery and drained the cyst and sealed a hole in the lining of McLaughlin's spinal cord. The cyst recurred, and Hellbusch performed surgery in May to remove the cyst and repair another hole that had developed in the spinal cord lining. Small portions of bone were removed in both surgeries, and the surgeries were successful. Hellbusch continued to monitor McLaughlin's recovery from surgery until August 11.

Hellbusch testified that in his last visit with McLaughlin, he informed her and her mother of the increased risk of progressive kyphosis and suggested that McLaughlin see a spine orthopedist. Hellbusch stated that upon McLaughlin's mother's inquiry as to whether Walsh could do the needed monitoring and x rays, Hellbusch advised her that Walsh could. The next day, Hellbusch sent a letter to L. Joseph Fisher, M.D., McLaughlin's pediatrician, and sent a copy of the letter to Walsh, stating, "We should be on the lookout for any evidence of thoracic scoliosis or kyphosis" as a result of the surgeries. The letter further stated, "I suggested that she might ask Dr. Walsh to do spine x-rays at intervals, perhaps on a yearly basis since she will be seeing him for her knee problem anyway." The evidence is in dispute as to whether Hellbusch's oral statements to McLaughlin and her mother and the letter were sufficient to constitute a referral.

Fisher periodically treated McLaughlin after the surgeries for unrelated ailments. During a visit on February 14, 1990, Fisher testified that he physically examined McLaughlin and noted a lack of abnormal kyphosis. Fisher told McLaughlin at that visit that she needed to check back with Walsh. However, McLaughlin never went to see Walsh at any time after the August 11, 1988, conversation with Hellbusch.

The record reflects that McLaughlin had a normal spine prior to the surgeries that Hellbusch performed. A magnetic resonance imaging performed between the two surgeries showed that McLaughlin still had a normal spine, and she had a normal spine on August 11, 1988, when Hellbusch last saw her. However, she subsequently developed progressive kyphosis,

which is an abnormally increased posterior curvature of the thoracic spine. She was diagnosed with this condition in July 1990. Progressive kyphosis is a known postsurgical risk in children who have undergone the type of surgery that Hellbusch performed, and Hellbusch was aware of that risk. McLaughlin underwent corrective surgery in May 1991, which has improved but not eliminated the condition.

### TRIAL PROCEEDINGS

McLaughlin sued Hellbusch, asserting that Hellbusch committed malpractice by failing to provide appropriate postoperative care including the monitoring, diagnosis, and treatment of progressive kyphosis. Robert B. Winter, M.D., a specialist in orthopedic surgery, testified as an expert for McLaughlin. Winter stated that a physician cannot detect kyphosis by a physical examination only. He stated that detection of kyphosis is done by taking certain x rays of the spine at regular intervals and measuring the spine. Winter testified that Hellbusch breached the standard of care because Hellbusch failed to refer McLaughlin to a spine specialist who could monitor her for the development of progressive kyphosis. He stated that Walsh did not have the expertise to properly detect kyphosis as early as a spine specialist would.

Daniel L. McKenney, M.D., a neurosurgeon, testified as an expert for Hellbusch. He stated that Hellbusch met the standard of care. He stated that Hellbusch's recommendations to McLaughlin's mother, Fisher, and Walsh were sufficient to meet the standard of care. He stated that Walsh was competent to detect kyphosis.

Walsh testified he could not treat kyphosis. However, he stated that he could monitor for kyphosis by ordering the necessary spinal x rays and having a radiologist measure the kyphosis, although he also stated that he might have suggested someone else monitor for kyphosis if McLaughin had returned to see him after the surgeries. Fisher testified that he knew what kyphosis was and what symptoms to look for. He stated that he would see kyphosis "if it were grossly there, and I wouldn't see it if it were early there." Fisher stated that he could not treat kyphosis. Hellbusch also stated that he could not treat kyphosis.

At the end of the trial, McLaughlin moved for a directed verdict on the issue of liability. The court overruled the motion, stating that there were "abundant issues of fact for the jury to consider." The jury returned a verdict in favor of Hellbusch.

## ASSIGNMENTS OF ERROR

McLaughlin assigns, restated, that the trial court erred in failing to grant her motion for a directed verdict because (1) a physician who does not possess the requisite skill or knowledge to treat a patient's serious postsurgery medical complication has a fundamental duty as a matter of law to refer the patient to a specialist who is qualified to care for and treat that condition and (2) reasonable minds could not differ that Hellbusch failed to refer McLaughlin to a medical specialist qualified to treat the foreseeable and known, serious postsurgical complications.

## SCOPE OF REVIEW

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996). See *Haag v. Bongers, ante* p. 170, 589 N.W.2d 318 (1999). The party against whom a verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. *Haag v. Bongers, supra*; *McWhirt v. Heavey, supra*. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *McWhirt v. Heavey, supra*.

## ANALYSIS

McLaughlin contends that she was entitled to a directed verdict. She asserts that a surgeon's standard of care includes postoperative treatment of a patient. She claims that because Hellbusch did not know how to *treat* kyphosis and referred her to physicians who did not know how to *treat* kyphosis, he breached the standard of care as a matter of law. Hellbusch argues that the issue at trial was not whether Hellbusch was negligent for failing to refer McLaughlin to a physician who could *treat* kyphosis; rather, the issue was whether Hellbusch

properly referred McLaughlin to a physician who could *monitor* for the onset of kyphosis, and as to that issue, the experts disagreed and thus created an issue of fact that was properly presented to the jury.

In a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was the proximate cause of the plaintiff's alleged injuries. *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). The burden of establishing these elements " 'rests upon the plaintiff's introduction of expert medical testimony.' " *Anderson v. Moore*, 202 Neb. 452, 465, 275 N.W.2d 842, 849 (1979), quoting *Kortus v. Jensen*, 195 Neb. 261, 237 N.W.2d 845 (1976). While McLaughlin's petition left open the issue of treatment, her sole expert witness, Winter, did not testify that Hellbusch was negligent for failing to refer McLaughlin to a physician who could treat kyphosis. Winter testified as to what the generally accepted standard of care would be to *detect* the *development* of kyphosis, then testified as follows:

> Q. . . . Do you have an opinion based upon a reasonable degree of medical certainty as to whom it is that is qualified or appropriate to perform this type of *monitoring* of kyphosis?
>
> A. Yes, I do.
>
> Q. And, Doctor, who is that please?
>
> A. That should be done by a spine specialist, somebody who knows how to take the appropriate x-rays, because these are often non-standard x-rays, who knows how to measure them properly. In other words, knows what to look for on those films.
>
> . . . .
>
> Q. Now, Doctor, you testified that in your opinion, then, Doctor Hellbusch failed to meet the minimum standard of care in that he failed to take serial x-rays to *monitor* for [McLaughlin's] kyphosis; is that correct?
>
> A. Yes, he failed to do that or conversely he failed to send her to an expert who could do that.
>
> . . . .

Q. . . . [W]ho had had the ultimate responsibility for following up this patient to ensure or *monitor* for the development of kyphosis?

A. Following Doctor Hellbusch's surgery, it's his responsibility to either do the *monitoring* himself or to refer her to an appropriate person to do the *monitoring*.

(Emphasis supplied.) Winter stated that a neurologist, orthopedist, or family practitioner would not be qualified to "detect" kyphosis.

Winter then testified that a surgeon who has performed a laminectomy has a duty to *monitor* the laminectomy patient for the onset of kyphosis, either himself or herself, if qualified, or by referring the patient to an appropriate spine specialist for monitoring. Winter did not testify that Hellbusch needed to refer McLaughlin to a physician who could treat kyphosis. In fact, Winter stated on cross-examination that the person monitoring for kyphosis need not be the person who would perform the corrective surgery if the condition developed.

Notwithstanding the lack of expert testimony, McLaughlin argues that as a matter of law, a surgeon's standard of care includes subsequent, or postoperative, treatment of a patient. McLaughlin derives this duty from four of our cases: *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981); *Toman v. Creighton Memorial St. Josephs Hosp., Inc.*, 191 Neb. 751, 217 N.W.2d 484 (1974); *Stacey v. Pantano*, 177 Neb. 694, 131 N.W.2d 163 (1964); and *Stohlman v. Davis*, 117 Neb. 178, 220 N.W. 247 (1928). These cases are distinguishable.

In *Momsen*, 210 Neb. at 56, 313 N.W.2d at 214, we stated that " ' "a physician is under the duty to give his patient all necessary and continued attention as long as the case requires it, and that he should not leave his patient at a critical stage without giving reasonable notice or making suitable arrangements for the attendance of another physician." ' " The patient in *Momsen* had just had a hysterectomy, and within hours of the surgery, while still in the hospital, her blood pressure dropped. The surgeon had gone home and did not return to the hospital upon receiving this information. The patient died. In the instant case, McLaughlin was not in a "critical stage" at the time

Hellbusch made the referral. She did not suffer from progressive kyphosis when she left Hellbusch's care, and if she was to develop the condition, it was not going to develop within hours. Indeed, McLaughlin was diagnosed with progressive kyphosis in July 1990 and did not have corrective surgery until May 1991, and Winter testified that McLaughlin's condition did not appreciably deteriorate further during that period between diagnosis and surgery. Further, nothing in the words "suitable arrangements" creates a duty as a matter of law that requires a referral to a physician who can *treat* a condition, especially when that condition has not yet presented itself. We conclude *Momsen* is not applicable to the instant case.

In *Stohlman*, 117 Neb. at 184, 220 N.W. at 250, we stated that " 'a physician who leaves a patient in a critical stage of the disease, without reason, or sufficient notice to enable the party to procure another medical attendant, is guilty of a culpable dereliction of duty, and is liable therefor.' " In *Stohlman*, the physician left town without telling the patient. The duty that was breached was that of the physician to secure the patient's acceptance of another doctor or give the patient notice so that the patient could secure another physician or surgeon of the patient's own choice. *Id.* Again, McLaughlin was not in a "critical stage." And, if the argument is that Hellbusch never secured another physician to continue the proper care for McLaughlin, that evidence is in dispute and thus was a proper question for the jury. Again, as with *Momsen*, we do not read *Stohlman* to require as a matter of law that the "arrangements" for another physician be a referral to a physician who can treat a condition that the patient does not yet have and may not ever develop.

*Stacey, supra*, and *Toman, supra*, stated that postoperative treatment and advice by the physician to the patient are interwoven and essential parts of the physician-patient relationship. That statement, however, was made in an attempt to define when the statute of limitations begins to run for a medical malpractice action against a physician. The statement did not create a duty as a matter of law to provide particular care or treatment.

Finally, we note that McLaughlin argued in her brief that absent granting her a directed verdict, the district court erred in refusing to give four proposed instructions to the jury. That

error was not assigned. Errors which are argued but not assigned will not be considered by an appellate court. *Miller v. City of Omaha*, 253 Neb. 798, 573 N.W.2d 121 (1998); *Mischke v. Mischke*, 253 Neb. 439, 571 N.W.2d 248 (1997).

## CONCLUSION

We conclude that the district court did not err in denying McLaughlin's motion for a directed verdict. The issue actually before the jury—whether Hellbusch referred McLaughlin to an appropriate physician for monitoring—was disputed by the experts and thus created a factual dispute that the jury properly considered. We affirm the district court's decision.

AFFIRMED.